SPACE CENTER, INC., Appellant,

v.

451 CORPORATION et al., Respondents.

No. 50281.

Supreme Court of Minnesota.

Oct. 17, 1980.

O'Connor & Hannan and Joe Walters and Frank Walz, Minneapolis, for appellant.

Henson & Efron, Robert F. Henson and Stuart Williams, Minneapolis, for respondents.

Heard before OTIS, PETERSON, and SCOTT, JJ., and considered and decided by the court en banc.

OTIS, Justice.

Space Center, Inc. brought an action for damages against 451 Corporation, Arthur G. Mueller, and Oliver N. Dyste for breach and anticipatory breach of an option contract and a purchase agreement under which Space Center was to acquire title to certain warehouse and office properties in Minneapolis. The jury returned a verdict in favor of Space Center. The trial court vacated the jury verdict and entered judgment against Space Center on defendants' counter–claim for unpaid rent. Space Center appeals claiming the trial court incorrectly interpreted the contract. We reverse.

The essential facts are not in dispute. Arthur G. Mueller, a defendant, and his original business associate, Douglas H. Peterson, were developers of an office–warehouse project on a seventeen–acre tract in the Mid–City Industrial Park in Minneapolis. In mid–1972 defendant Oliver N. Dyste left his employment with Heitman Mortgage Company and bought out Peterson so that he (Dyste) and Mueller could complete the development of property in question.

Mueller and Dyste formed 451 Corporation in which they were equal shareholders. 451 Corporation took title to the project and assumed the obligations of the Commanche Corporation (successor to the Douglas H. Peterson Company) under the construction loan. Mueller and Dyste personally guaranteed the loan. Commanche Corporation was dissolved.

Mueller and Dyste formed 451 Corporation, rather than a partnership, in order to avoid usury law limits on interest rates that could be charged to partnerships. However, Dyste and Mueller wanted to take the tax benefits of depreciation and interest deductions against their individual incomes. To that end they formed a partnership called 451 Company which held an unrecorded contract for deed to the 451 property under which 451 Company could demand conveyance of legal title from 451 Corporation. 451 Corporation contracted with 451 Company for 451 Company to manage the property. Under the agreement, 451 Company, the partnership, paid al¹ expenses and received all of the income from the property. None of the partnership arrangements was disclosed to Space Center until discovery proceedings attendant to this lawsuit.

The project was financed by a temporary construction loan from Heitman Mortgage Company. The loan was secured by a mortgage on the property. Because Mueller and Dyste were unable to obtain permanent financing by the time the construction loan came due, Heitman formally extended the maturity date on the mortgage three times. First, it was extended to January 31, 1973, then to May 31, 1973, and finally to March 31, 1974. The first two extensions were recorded, but the third was not. After March 31, 1974, Heitman agreed not to foreclose for some unspecified period provided the interest was paid monthly.

The property had been certified for occupancy in April 1972, but no major tenant was found until Space Center expressed an interest in purchasing the property in late 1972. On April 5, 1973, 451 Corporation and Space Center signed a letter of intent which outlined the basic terms of their agreement under which Space Center agreed to lease some of the property for five years with an option to purchase the property at the end of the lease period for

$3,400,000. The lease was executed on April 16, 1973, and was amended to cover most of the building on August 26, 1974. (The provisions relevant to this suit were not changed.) The lease was to expire on April 15, 1978, with monthly installments of rent of $27,491.83 ($329,902.00 annual rent). Space Center also agreed to pay, as additional rent, all real estate taxes and assessments apportionable to the percentage of the premises it leased.

The option contract was not signed by 451 Corporation until April 1974. The purchase agreement at issue in this case was attached to and was part of the option agreement. Under the option and purchase agreement 451 Corporation agreed to convey marketable title to Space Center for $3,400,000 if Space Center exercised its option on or before July 1, 1977. The agreement also provided that, within a reasonable time after Space Center executed and delivered the purchase agreement, 451 Corporation would furnish Space Center with an abstract of title or registered property abstract. Space Center was then allowed ten days to examine title and note any objections to it. 451 Corporation was, in turn, "allowed 120 days from the date of written objections thereto * * * to make such title marketable." The agreement provided that if the title "is not marketable and is not made so within [the] 120 days * * *, this agreement shall be null and void."

Defendants paid some of the interest, on the Heitman loan, monthly through August 1974. By September 1974, approximately $100,000 unpaid interest had accrued. Heitman informed defendants that it would no longer extend the loan and that the full amount of principal and interest was due on October 31, 1974. Defendants were unable to pay Heitman because their efforts to obtain long–term financing during 1973 and 1974 were unsuccessful and because they did not have $3,100,000 cash. Heitman foreclosed in November 1974.

451 Corporation defended the foreclosure action so that trial was delayed until October 1975. Judgment was entered against 451 Corporation, Mueller, and Dyste for $3,570,260.60.

The foreclosure sale was held on January 28, 1976. Although Space Center was present, the only bidder was Heitman which initially bid $3,400,000. Upon protest by respondents' attorneys, that the bid was inadequate, Heitman raised its bid to $3,615,089.69 representing the full amount of the debt to that date. Thus, respondents were relieved of the burden of a deficiency judgment which would have otherwise remained. The higher bid also meant a higher redemption price for Space Center had it chosen to redeem. Defendants did not redeem; after the redemption period expired on January 31, 1977, they lost all rights in the property.

Defendants also did not pay the real estate taxes for the second–half of 1974 and for all of 1976. The 1974 tax was not paid, even though each tenant had paid its proportionate share of the taxes to 451 Corporation.

For each 1976 tax assessment Space Center tendered a check, payable to 451 Corporation and Hennepin County, jointly, for its portion of the tax. The check was refused by 451 Corporation, and Space Center paid the whole amount of the taxes directly to Hennepin County.

Space Center offered to buy the property repeatedly from 1974 through 1976. At least one proposal was rejected even before a specific price was mentioned. At another meeting, after the foreclosure proceedings were initiated, Space Center offered to satisfy the Heitman loan in full, which by that time was more than the option price, and to pay defendants an additional sum to be negotiated. This offer was also refused.

Space Center filed this action on February 6, 1976, a week after the foreclosure sale and within the redemption period, alleging that 451 Corporation had anticipatorily breached the option contract. In defendants' answer to the complaint, defendants alleged non–exercise of the option. Space Center then exercised the option on April 2, 1976, by signing the purchase agreement and delivering it and the $5,000

earnest money to 451 Corporation. Even though Mueller and Dyste knew they could not perform the agreement and had no intention of performing it, they signed it and returned it to Space Center. As required, 451 Corporation then sent the registered property abstract. By letter dated April 30, 1976, Space Center noted the sheriff's certificate of the foreclosure sale in an amount in excess of $3,400,000 as an objection to title. On September 9, 1976, 451 Corporation advised Space Center the purchase agreement was null and void by operation of its own terms, since 120 days had expired without the title defect having been cured.

Space Center began withholding rent in May and June 1976, and paid the real estate taxes directly to Hennepin County, rather than as additional rent to 451 Corporation. Space Center paid the delinquent 1974 second–half taxes and the 1976 first–half taxes, claiming a right to do so under Minn. Stat. § 272.45 (1978). Space Center withheld June and July rents to offset the taxes paid, again claiming authority to do so under Minn.Stat. § 272.45 (1978). The August 1976 rent was withheld, in part, as a tax offset and, in part, as an offset for utilities paid by Space Center on 451 Corporation's behalf.

Space Center withheld rent payments for September, October, November, and December 1976, as offsets against its unadjudicated damage claims in this action. For the second–half taxes of 1976, Space Center again tendered a check, made out to both Hennepin County and 451 Corporation, that was refused by 451 Corporation. Space Center paid the taxes and withheld the January 1977 rent, in part, as an offset against the taxes paid in excess of Space Center's share and, in part, as an offset against the damages claimed in this action.

When Space Center withheld rent, 451 Corporation notified them in May and June 1976, that 451 Corporation was terminating the purchase agreement because the withholding of rent constituted an obvious default of the lease agreement.

Ultimately, after the period of redemption expired, Space Center, acting through a wholly owned subsidiary, acquired the title from Heitman's assignee for $3,833,-500.

1. The primary issue is whether a clause in a purchase agreement, that would render the agreement null and void if the vendor does not remedy a title defect, operates to nullify automatically the contract, where the title defect arose because of the vendor's financial inability to prevent the defect from arising when a mortgage was foreclosed. The clause in question reads as follows:

> If the title to the Premises is not marketable and is not made so within 120 days after the date of making written objections thereto as herein provided for in paragraph 3, this Agreement shall be null and void and neither party shall be liable for damages hereunder to the other, and the $5,000.00 paid by Buyer upon its execution of this Purchase Agreement, as provided in that certain option agreement dated April 5, 1974, between Seller, as Optionor, and Buyer, as Optionee, pursuant to which this Purchase Agreement was executed, shall be refunded to Buyer.

■■ In the absence of a remedy–limiting clause, a vendor is liable for damages for breach of contract for failure to convey marketable title where the vendor has otherwise agreed to convey marketable title. Parties are free to limit remedies for non–performance and to provide for the annulment of the contract on the occurrence of certain conditions. *Raymond v. McKenzie*, 220 Minn. 234, 237, 19 N.W.2d 423, 424–25 (1945). We have enforced purchase agreement clauses that automatically void the agreement where title "is not marketable and cannot be made so", and in cases where the title defect was known to all parties before the agreement was signed but where, despite good faith efforts to make title marketable, the vendor was unable to do so. *Raymond v. McKenzie*, 220 Minn. 234, 19 N.W.2d 423 (1945); *Schwab v. Baremore*, 95 Minn. 295, 104 N.W. 10 (1905). We have not previously construed the "is not marketable and is not made so" language at issue in this case.

Defendants argue that the plain language of the clause should be given effect such that any uncorrected title defect will nullify the contract. Defendants argue that upholding the nullification is particularly appropriate in this case because both sides were represented by counsel during the negotiation and drafting of the agreement and because Space Center knew, or should have known, that there was a risk that defendants would lose title to Heitman by foreclosure of the mortgage. Indeed, defendants contend that the clause in question was inserted specifically to transfer to plaintiff the risk of defendants' loss of title by foreclosure. Defendants secondarily argue that if they had any duty at all with respect to title, their duty was only to make good faith efforts to preserve marketable title, which efforts they claim to have made.

Plaintiff argues that the rule, that a party to a contract cannot avoid its duties under the contract by preventing the performance of the other party or by disabling itself from performance, applies in this case to preclude defendants from escaping liability for non–performance because the title defect was the defendant's legal responsibility, not the plaintiff's responsibility. Plaintiff contends that this clause does not transfer to plaintiff the risk of the defendants' financial inability to preserve marketable title. Plaintiff argues that defendants' loss of title constitutes an anticipatory breach by repudiation of the contract, since defendant clearly would not have been in a position to convey marketable title and had no intention of performing the contract at the expiration of the lease period in April 1978.

██ The loss of title by defendants was an anticipatory breach or breach of the option and purchase agreement, only if defendants had a duty under the option and purchase agreement to preserve their ability to convey marketable title.

██ The law in Minnesota has long been that "A party who has entered into an obligation to pay will not be permitted to set up his own voluntary default to defeat the same, unless such intention clearly and unequivocally appears" in the contract. *Dana v. St. Paul Investment Co.*, 42 Minn. 194, 195, 44 N.W. 55, (1889). A review of the cases enforcing null and void clauses reveals that in all cases, except one, the title defect pre–existed the purchase agreement and was known or was obvious to all parties. *E. g. Schwab v. Baremore*, 95 Minn. 295, 104 N.W. 10 (1905).

In *Joslyn v. Schwend*, 85 Minn. 130, 88 N.W. 410 (1901) the defect arose after the purchase agreement was signed, but was solely due to the actions of a third party who filed a notice of lis pendens. The vendor was not responsible in any manner for the filing of the lis pendens. Indeed, the vendor diligently and in good faith attempted to clear the title, but was unable to do so within the time allotted in the contract.

In a more recent case we gave effect to the null and void clause where the agreement was conditioned on the purchaser receiving immediate possession and the vendor could not deliver immediate possession. *Raymond v. McKenzie*, 220 Minn. 234, 19 N.W.2d 423 (1945). The purchaser had full knowledge that the property was leased for a period extending beyond the date by which the purchaser wanted possession. Thus, the purchaser signed the agreement, knowing that the agreement was expressly conditioned on the ability of the vendor to transfer possession.

The case before us is clearly distinguishable from each of the cases just discussed. Unlike *Raymond v. McKenzie*, the option and purchase agreement here were not expressly contingent on defendants' refinancing or on their being able to preserve their ability to convey marketable title.‧ The contract has only a general defects clause. Unlike *Joslyn v. Schwend*, here there is no third party who is responsible for the defect. Defendants themselves are responsible for the foreclosure because of their failure to refinance the property. Unlike the remaining cases the defects here did not exist before the option and lease were signed, and plaintiff did not know of the

defect, or even the likelihood of a defect arising, before the option and lease were signed.

 We hold that the general defects clause in this purchase agreement does not apply to defects that arise from factors within the control of the vendors. We cannot accept the interpretation that would allow vendors to escape performing the overall purpose of the transaction, that of the sale of real property, by creating a title defect. If the parties had intended the particular contingency, i. e., the foreclosure to be a condition of the vendor's duty to perform, the experienced attorneys and corporate officers on both sides would have so provided in express language as was done in *Raymond v. McKenzie*, 220 Minn. 234, 19 N.W.2d 423 (1945) (immediate possession condition), and in *Heisley v. Swanstrom*, 40 Minn. 196, 41 N.W. 1029 (1889) (agreement conditioned on vendor clearing title of specific defects).

Defendants argue that, despite their good faith efforts, they were unable to prevent the foreclosure because they were unable to get a profitable mortgage; they assert that economic conditions beyond their control deteriorated so severely that mortgages were not available or were available only at prohibitively high interest rates. Financial inability to perform a contract does not excuse nonperformance. Obviously, a seller is always entitled to a judgment against an insolvent buyer. *See,* Corbin, *Corbin on Contracts* § 1332 (1962). Therefore, vis–a–vis the purchase agreement, defendants are legally responsible for the foreclosure. Consequently, we hold that defendants had a duty to preserve their ability to convey marketable title, and that they are liable for damages caused by their breach of that duty.

 2. Plaintiffs argue that defendants' loss of title constitutes an anticipatory breach of the option and purchase agreement. Defendants' position is that they never repudiated the option or purchase agreement, or that if they are held to have repudiated the contracts, plaintiff's claim for repudiation was waived when plaintiff executed the option.

We have described anticipatory breach as follows:

[W]here one party to an executory contract, before the performance is due, expressly renounces the same and gives notice that he will not perform it, his adversary, if he so elects, may treat the renouncement as a breach of the contract and at once bring an action for damages. * * *.

\* \* \* \* \* \*

[T]he refusal to perform must in effect be an unqualified renunciation or repudiation of the contract. A mere refusal, not of that character, will not obviate the necessity of a tender.

*Matteson v. United States & Canada Land Co.*, 103 Minn. 407, 410, 411, 115 N.W. 195, 196–97 (1908). An option contract, like other contracts, can be anticipatorily breached by repudiation. *Saltman v. Dunham*, 241 Or. 399, 406 P.2d 153 (1965). Where a party to an executory contract places itself in a position where it cannot perform the contract, or where the party otherwise prevents performance of the contract, the other contracting party may treat the contract as anticipatorily breached. *E. g., Wormsbecker v. Donovan Constr. Co.*, 247 Minn. 32, 42, 76 N.W.2d 643, 650 (1956). *Crowell v. Northwestern National Life & Savings Co.*, 99 Minn. 214, 219, 108 N.W. 962, 964 (1906). *Accord, McFerran v. Heroux*, 44 Wash.2d 631, 269 P.2d 815 (1954).

 Defenders' irrevocable loss of title was sufficient conduct to constitute a repudiation. Defendants breached their duty to preserve their ability to convey marketable title. They could not convey what they did not have. After the sheriff's sale on January 28, 1976, defendants lacked the ability to perform under the purchase agreement and testified that thereafter they no longer had any intention of selling the property to Space Center. We are not broadening the definition of an anticipatory breach. The doctrine is still narrowly applied. In this case plaintiff did not simply doubt defendants' ability to perform. Both

parties knew defendants could not and would not perform, and that they did not intend to do so. Under these circumstances it would work an unnecessary and unjust hardship on plaintiff to be forced to wait until the time for final performance arrived.

3. Having held that defendants repudiated the option and purchase agreement, we consider whether they effectively retracted their repudiation. Where there is an anticipatory breach, the injured party can elect to sue immediately, or he can wait for the time when performance is due. *Tarpy v. Nowicki*, 286 Minn. 257, 175 N.W.2d 443 (1970). Where the injured party has not made an election, or has not changed its position in reliance on the repudiation, the repudiating party may retract its repudiation. In the instant case, plaintiff sued for anticipatory breach on February 6, 1976, after the foreclosure sale. This would be a sufficient election.

However, after it had filed suit, plaintiff exercised the option, and 451 Corporation signed the purchase agreement and accepted the $5,000 earnest money. The trial court held that plaintiff's exercise of the option gave 451 Corporation the opportunity to retract its repudiation by signing the purchase agreement. Plaintiff was held to have waived the anticipatory breach claim in favor of any claims it could make for breach of the purchase agreement.

Plaintiff may have waived its claim for anticipatory breach under the option contract, but it did not waive its claims under the purchase agreement. As discussed above, defendants cannot rely on the general title defects clause to excuse them from a duty to preserve their ability to convey marketable title where the defendants are responsible for their inability to convey. Thus, the defendants' irrevocable loss of title constitutes an independent repudiation of the purchase agreement.

4. Defendants sought to avoid liability on the purchase agreement by terminating the contract when plaintiff withheld rent due under the lease from May 1976 through January 1977. However, a repudiating party cannot set up the other party's subsequent nonperformance or a breach to avoid liability for its own prior total breach. *Craigmile v. Sorenson*, 248 Minn. 286, 80 N.W.2d 45 (1956). Defendants cannot rely on plaintiff's breach of the lease to terminate the purchase agreement and avoid liability for their own anticipatory breach.

5. Defendants challenge plaintiff's right to withhold rent after defendants' repudiation. Plaintiff claims the right to withhold rent payments to pay the real estate taxes for 1976 ($112,527.58) and the delinquent real estate taxes for the second half of 1974 ($71,029.37). Plaintiff claims the right to pay the taxes under Minn. Stat. § 272.45 (1978) which provides, in pertinent part, as follows:

> When any tax on land is paid by * * * any * * * tenant, * * * which [tax], by agreement or otherwise, ought to have been paid by the * * * lessor, such * * * tenant * * * may recover by action the amount which such * * * lessor * * * ought to have paid, with interest thereon at the rate of 12 percent per annum, or he may retain the same from any rent due or accruing from him to such * * * lessor for land on which such tax is so paid.

The key issue is whether 451 Corporation, "by agreement or otherwise, ought to have paid" the real estate taxes. Plaintiff claims that the lease clause, providing for additional rent to be paid twice annually as measured by taxes due, imposed on 451 Corporation the obligation to pay the real estate taxes.[1] Plaintiff argues that the addition-

---

1. The lease clause reads, in part, as follows: Tenant shall pay to Landlord as additional rent all taxes and assessments * * * due and payable with respect to [the Leased premises] in each calendar year during the term of this Lease. * * * Landlord shall submit to Tenants statements for such taxes, assessments and impositions. Tenant shall pay to Landlord said taxes and assessments at least 10 days before same becomes due and payable at the place designated for payment of the annual rent.

al–rents clause in this case should be interpreted in the manner we treated a similar additional–rents clause in *Klass v. Twin City Federal Savings & Loan Ass'n*, 291 Minn. 68, 190 N.W.2d 493 (1971). The clause in *Klass*.provides as follows:

> Tenant agrees to pay to Lessor as additional rent for said premises on the first day of each and every month during the term of this lease, one–twelfth of the total real estate taxes and installments of special assessments levied on said premises, payable during the calendar year of which each particular month is a part,
> * * *.

291 Minn. 68, 69, 190 N.W.2d 493. In *Klass* the trial court had held that "although the lease described the taxes 'as additional rent,' the obvious intention of the parties was that the tenant would simply pay whatever taxes were due in addition to a fixed amount." 291 Minn. 68, 70, 190 N.W.2d 493, 494. Such intention is equally plain in this case.

Nonetheless, *Klass* is different from this case. In *Klass* the issue was whether the lessor or the lessee was entitled to the portion of a condemnation award intended to repay real estate taxes. We held that the lessee was entitled to the refund for taxes paid as provided under Minn.Stat. § 117.12 (1969), because, as we stated in *Klass*, "We agree with the trial court that taking the lease by its four corners it is obvious the parties intended that the tenant assume the taxes only if the taxes were due," and because the statute essentially meant that "as a practical matter, no taxes were payable" in the relevant year. 291 Minn. 68, 70–71, 190 N.W.2d 493, 494. In *Klass* no taxes were due, while in this case they were.

 In a true landlord–tenant relationship the additional–rents clause might not constitute an agreement by the landlord to pay the taxes. However, under the facts of this case, where the parties were also in a long–term relationship as optioner–optionee followed by vendor–purchaser, and where defendants had agreed to convey marketable title, we hold that defendants were obligated to pay the real estate taxes;

their failure to do so entitled plaintiff to pay them and withhold rents for that purpose. Plaintiff was not entitled to withhold rents in excess of the taxes due, and consequently is liable for damages for breach of the lease.

 6. The amount of compensatory and punitive damages to which Space Center is entitled must now be considered. Space Center seeks to reinstate the jury award of punitive damages against defendants which was set aside by the trial court. We have consistently held that "extra–contract damages are not recoverable for breach of contract except in exceptional cases where the breach is accompanied by an independent tort." *Haagenson v. National Farmers Union Prop. and Cas. Co.*, 277 N.W.2d 648, 652 (Minn.1979). Space Center argues that Mueller and Dyste are liable as individuals for their independent torts of malicious interference in the contractual relations between Space Center and 451 Corporation, and of the fraudulent diversion of 451 Corporation's assets, which diversion injured Space Center. We have previously held, "A malicious or bad–faith motive in breaching a contract does not convert a contract action into a tort action." *Wild v. Rarig*, 302 Minn. 419, 442, 234 N.W.2d 775, 790 (1975). The actions of Mueller and Dyste as individuals cannot be separated sensibly from the action of 451 Corporation so as to find that these individuals induced the corporation to breach the contract, where they are the sole owners, officers, and directors of the corporation. We hold that under the facts of this case there was no tort independent of the breach of contract claim; therefore, the trial court's disallowance of punitive damages was proper.

 Space Center is entitled to compensatory damages for the benefit of its bargain and for amounts wrongfully withheld by 451 Corporation. The jury properly awarded Space Center $433,500. In addition, the trial court's findings and conclusions are correct, awarding Space Center $1,713.44 for utility bills wrongfully not paid by 451 Corporation and $5,000 for the

earnest money wrongfully not refunded by 451 Corporation.

██ Space Center was entitled to withhold rent equal to the amount of taxes it paid on behalf of 451 Corporation. On June 2, 1976, Space Center paid the first–half 1976 taxes and the delinquent 1974 taxes including penalties and interest. Space Center withheld rent for all of June, July, and for most of August 1976 as an offset against its payments of the 1974 taxes and the amount of first–half 1976 taxes it paid in excess over its proper proportion of taxes due. The balance of the August 1976 payment was withheld to offset amounts due on the utility bill that Space Center paid on behalf of 451 Corporation. The September through December 1976 rents were wrongfully withheld as a set–off against its damages claim for breach of the contract. Space Center withheld part of the January 1977 rent as a set–off against the excess taxes it had paid for the second–half of 1976, with the remainder wrongfully withheld as a set–off against damages in this action. 451 Corporation repeatedly notified Space Center that the lease was terminated. Thus, Space Center became liable for the fair market value of rental of the premises which was permissibly measured at the agreed upon rent after Space Center was no longer lawfully withholding rent. Space Center is liable to 451 Corporation for all rent improperly withheld and for interest thereon as provided in the lease. This amount including interest is to be set off against the amount of defendants' liability to Space Center. The attorneys fees award was not raised on appeal.

Reversed and remanded for further proceedings consistent with this opinion.

AMDAHL and SIMONETT, JJ., not having been members of this court at the time of argument and submission, took no part in the consideration or decision of this case.