**Al PODLESNICK, Plaintiff,**

v.

**AIRBORNE EXPRESS, INC.,**
**Defendant.**

**No. C–3–81–453.**

United States District Court,
S.D. Ohio, W.D.

Jan. 13, 1986.

Ralph A. Skilken, Jr., Dayton, Ohio, for plaintiff.

Jefferson D. Kirby, III, Atlanta, Ga., Nicholas Hollenkamp, Dayton, Ohio, for defendant.

OPINION; DECISION AND ENTRY SETTING FORTH FINDINGS OF FACT AND CONCLUSIONS OF LAW; NOMINAL DAMAGES AWARDED TO PLAINTIFF; PLAINTIFF'S REQUEST FOR REINSTATEMENT OVERRULED; PLAINTIFF'S REQUEST FOR PUNITIVE DAMAGES OVERRULED; JUDGMENT TO BE ENTERED FOR PLAINTIFF ON THE ISSUE OF DAMAGES; TERMINATION ENTRY

RICE, District Judge.

Plaintiff Al Podlesnick was terminated by Defendant Airborne Express, Inc., on May 15, 1981 from his position as chief pilot. Plaintiff had previously served Defendant as a line pilot. After trial to the Court, judgment was entered in favor of Plaintiff and against the Defendant on the issue of liability. (Doc. # 69). The Court found Plaintiff to prevail on his claim for breach of contract, while Defendant was found to prevail on Plaintiff's claims under the Railway Labor Act (RLA), 45 U.S.C. § 151 *et seq.* Briefs and proposed findings of fact and conclusions of law were subsequently filed by the parties and a hearing was held on July 3, 1984 on the question of a remedy for Plaintiff.

For the following reasons, the Court concludes that Plaintiff is entitled to only nominal damages and that Plaintiff is not entitled to recover punitive damages. Finally, Plaintiff is not granted the specific performance, namely reinstatement, which he seeks. In setting forth its reasoning, the Court assumes familiarity with its previous decisions in this case, particularly its March 29, 1984 opinion on the issue of liability (Doc. # 69) (hereinafter also referred to as March 29 opinion).

I. *Findings of Fact*

In conformity with Fed.R.Civ.P. 52(a), the Court sets out its findings of fact relevant to the issue of the remedy sought by Plaintiff.

(1) Plaintiff has withdrawn his request for attorney's fees. (Tr. 1628–29). Plaintiff chose not to offer testimony at trial on the issue of punitive damages. (Tr. 1629).

(2) Defendant established the Airborne Express System Board of Adjustment on November 26, 1980. (Plaintiff Trial Exh. 39–1, 39–2).

(3) Defendant no longer operates the Caravelle aircraft which Plaintiff is qualified to fly. Defendant now flies only DC–9 and YS–11 aircraft. Plaintiff is not qualified to fly either of these aircraft and has never flown either aircraft. (Tr. 1684, 1694, testimony of Podlesnick).

(4) Plaintiff has not received training in the current simulator for the DC–9, and did not previously complete DC–9 ground school. (Tr. 1685–86, testimony of Podlesnick).

(5) As of July 3, 1984, Plaintiff had flown approximately 100 hours since the May 15, 1981 date of his termination by Defendant. Approximately 50 hours of this flight time occurred in jet aircraft. Plaintiff was a pilot in command for 25 of

these flight hours, with the last of these hours flown on May 24, 1982. Plaintiff last served as a pilot in command of a jet aircraft on January 13, 1982 (Tr. 1689–90, testimony of Podlesnick).

(6) Both Plaintiff and Defendant are concerned about Plaintiff's lack of recent flight experience. (Tr. 1751, testimony of Kuli; Tr. 1688, testimony of Podlesnick).

(7) Plaintiff seeks reinstatement as a DC–9 captain with Defendant. More specifically, he seeks a requalification period of three months in order to become qualified to fly a DC–9. (Tr. 1683, 1691–92, testimony of Podlesnick).

(8) Defendant would incur costs of $7,200 in order to rehire Plaintiff and to train him to serve as a DC–9 captain. (Tr. 1739–40, testimony of Hete).

(9) During the period from November 17, 1980 through November 30, 1980, Plaintiff earned $1,707.69 as Defendant's chief pilot. Had Plaintiff served as a line pilot during that period, he would have earned $1,661.54. Thus, Plaintiff earned $46.15 more as chief pilot for the thirteen days remaining in his 180-day "probationary period" subsequent to Defendant's breach than he would have earned as a line pilot during that period. (Tr. 1745–46, testimony of Gibbons).

(10) Feelings of hostility and mistrust have been generated by the involvement of the parties in this litigation during the past several years. (Tr. 1634–35, 1752, testimony of Kuli).

## II. *Conclusions of Law*

(1) For purposes of analyzing Plaintiff's recovery, the breach by Defendant in this case is more analogous to the breach of an option contract than to the breach of an alternative contract. *Compare Saltman v. Dunham,* 241 Or. 399, 406 P.2d 153 (1965) *with Ach v. Herman A. Straus, Inc.,* 67 Ohio App. 452, 37 N.E.2d 99 (1941).

(2) Under Ohio law, an employment contract of indefinite duration is terminable at any time by either the employer or the employee with or without cause. *Henkel v.*

*Educational Research Council,* 45 Ohio St.2d 249, 344 N.E.2d 118 (1976).

(3) The bargained-for 180-day "probationary period" took Plaintiff's oral employment contract out of the employment at will doctrine for that limited 180-day period. (Opinion, Doc. # 69 at 19–20). At the expiration of the "probationary period," Plaintiff would have been terminable at will by Defendant, whether he had continued to serve as chief pilot or whether he returned to the line at that juncture.

(4) Plaintiff remained employed by Defendant as chief pilot for the thirteen days remaining in the "probationary period" subsequent to Defendant's repudiation of Plaintiff's option to return to the line. As Plaintiff's salary as chief pilot exceeded what he would have earned had he returned to the line for those thirteen days, *see* Finding of Fact # 9, *supra,* only nominal damages of $1.00 are awarded to Plaintiff.

(5) No authority supports an award of damages to Plaintiff extending beyond the 180 days of the "probationary period."

(6) The general rule under Ohio law is that specific performance of personal service contracts is prohibited. *Felch v. Findlay College,* 119 Ohio App. 357, 200 N.E.2d 353 (1963).

(7) The equities of the instant case are not sufficiently analogous to those in *State ex rel. Wright v. Weyandt,* 50 Ohio St.2d 194, 363 N.E.2d 1387 (1977), in which specific performance of a personal service contract was found to be warranted, to order reinstatement based on that decision.

(8) It is undesirable to order reinstatement in a case such as this, that is, after disputes have arisen and confidence and loyalty have ebbed. Restatement (Second) of Contracts § 367 Comment a (1979).

(9) Under Ohio law, punitive damages are not available for breach of contract. *Davis v. Tunison,* 168 Ohio St. 471, 155 N.E.2d 904 (1959).

(10) Plaintiff is a management official outside the scope of the coverage of the Railway Labor Act (RLA). (Opinion, Doc.

**1116**

# 69, Conclusions of Law "C" & "D"). Claims of anti-union activity by Defendant in violation of the RLA, even were such activity found by this Court, could not support an award of punitive damages to Plaintiff.

### III. *Discussion*

#### (A) *Back Pay*

As set forth in Finding of Fact # 5 of the March 29 Opinion, Plaintiff and Defendant agreed to a 90-day "probationary period" as a condition to Plaintiff's oral contract to serve as Defendant's chief pilot. Under this arrangement, Plaintiff retained the option of returning to the position of line pilot ("returning to the line") for 90 days. At the end of the 90 days, Plaintiff would either stay on as chief pilot or return to the line, depending on (1) Amiel (Mike) Kuli's evaluation of his performance and/or (2) Podlesnick's desire to stay on the chief pilot's job. (Doc. # 69, p. 8).

After the expiration of the first 90-day period of this nature, the parties agreed to a second 90-day period during which Plaintiff could opt to return to the line. On or about November 17, 1980, with thirteen days remaining on the second 90-day period, Defendant, through the statements of Kuli, unilaterally breached that portion of the employment contract permitting Plaintiff to return to the line. (Doc. # 69, Conclusion of Law "F"). Plaintiff did not request to return to the line at the time of Defendant's breach or upon the lapse of the 180-day period, but continued to serve as Defendant's chief pilot. He was terminated by Defendant on May 15, 1981, and, several weeks after said termination, unsuccessfully sought to return to the line. (Doc. # 69, Finding of Fact # 11).

Plaintiff now seeks damages for back pay. Defendant's position is that the rules governing damages for breach of an alternative contract preclude Plaintiff's recovery of damages and that, in any event, Plaintiff was terminable at will by Defendant and is thus not entitled to damages for breach.

Defendant characterizes the employment contract which it breached as an alternative contract, in that two separate employment options were to be available to Plaintiff at the end of the 180-day "probationary period." Damages for breach of an alternative contract "are determined in accordance with that one of the alternatives that is chosen by the party having an election, or, in the case of breach without an election, in accordance with the alternative that will result in the smallest recovery." 5A C. Corbin, Contracts § 1079, at 454 (1951). As Plaintiff had not selected either of his employment options at the time of Defendant's breach, Defendant contends that the rule pertaining to breach without an election of alternatives governs damages in this case. Defendant further contends that damages for breach of the chief pilot alternative would be the damages alternative which it would find the least onerous, given that Plaintiff had remained in the chief pilot position for the thirteen days which remained in the "probationary period" subsequent to Defendant's breach. Defendant concludes, under this rationale, that Plaintiff is entitled only to nominal damages.

This Court does not agree that the rules of recovery for breach of an alternative contract are suitable for application in this case. In the Ohio decision cited by Defendant, *Ach v. Herman A. Straus, Inc.,* 67 Ohio App. 452, 37 N.E.2d 99 (1941), as well as the other published cases which have applied this rule of damages, the party in breach is the party which had *itself* retained the possibility of performing one of two acceptable alternatives in order to discharge its contractual obligation to the other party. *See Matter of Community Medical Center,* 623 F.2d 864 (3rd Cir. 1980); *Prudential Ins. Co. of America v. Faulkner,* 68 F.2d 676 (10th Cir.1934); *Branhill Realty Co. v. Montgomery Ward and Co.,* 60 F.2d 922 (2nd Cir.1932). Under such circumstances, the rule limiting damages to those flowing from the alternative least onerous to the defendant can be seen as a recognition of the flexibility which had been bargained for by the party in breach.

In this case, on the other hand, Plaintiff had the option of performing one

of two alternative performances at the end of the 180-day period. While Plaintiff needed Defendant's concurrance to stay on as chief pilot, the record indicates that there was no impediment to him alone opting to return to the line at the end of the 180 days. Indeed, that was precisely what Plaintiff had bargained for. (Tr. 10–17; testimony of Podlesnick). Given that Plaintiff was the party retaining the flexibility of performance, the damages theory relating to alternative contracts is inappropriate and ought not to govern this case. *Cf.* Restatement (First) of Contracts § 344, Ill. 2 (1932).

For purposes of analyzing Plaintiff's recovery, the Court believes the breach in this case to be more analogous to the breach of an option contract. As discussed in the March 29 opinion (Doc. # 69, at 22), the 180-day "probationary period" gave Plaintiff the option to either stay on as chief pilot, provided that Defendant concurred, or to return to the line. Defendant repudiated the latter option. In *Saltman v. Dunham*, 241 Or. 399, 406 P.2d 153 (1965), plaintiffs had a two-year option to buy certain real estate from defendant. As a condition precedent to exercise of the option, plaintiffs were to obtain the lease to the property then held by defendant's lessee. Defendant then sold the property to another party before the end of the option period, making it impossible for plaintiffs to comply with the condition precedent. The Oregon Supreme Court found that defendant had deprived plaintiffs of the balance of the option period, during which time they might have acquired the existing lease to the property and thus become able to exercise their option to purchase. *Id.*, 406 P.2d at 155. The *Saltman* court emphasized that a defendant who breaches an option contract will not be later heard to avoid damages due to the uncertainty as to whether the option would have in fact been exercised, given the defendant's role in creating the element of speculation. *Id.; see Space Center, Inc. v. 451 Corp.*, 298 N.W.2d 443 (Minn.1980); Restatement (Second) of Contracts § 253, Ill. 3 (1979).

Even with the analogy to the breach of an option contract, this Court finds the employment at will doctrine to block the damages for back pay sought by Plaintiff. There is no dispute that Plaintiff's employment as chief pilot, upon the expiration of the 180-day "probationary period," was terminable at will by either party. As for the employment option foreclosed by Kuli's repudiation, that of Plaintiff's opportunity to reclaim his former position as a line pilot, that, too, would have been employment at will. In other words, even had Plaintiff opted to return to the line, he could legally have been terminated without cause at any time, with no damages recoverable for any salary period subsequent to termination. *Henkel v. Educational Research Council of America*, 45 Ohio St.2d 249, 344 N.E.2d 118 (1976); *Welch v. Brown's Nursing Home*, 20 Ohio App.3d 15, 484 N.E.2d 178 (1984). Thus, the only damages which remain available to Plaintiff are those for the thirteen final days of the "probationary period" during which he was unable to exercise his bargained-for option to return to the line. As Plaintiff served, during those thirteen days, as chief pilot, and drew a salary higher than he would have had he returned to the line for that period, only nominal damages are recoverable by Plaintiff.

Plaintiff attempts to counter the applicability of the employment at will doctrine by pointing to the system boards of adjustment created by the Railway Labor Act for redress of disputes.[1] Evidence admitted at trial (Plaintiff Trial Exh. 39–1, 39–2) shows establishment by Defendant on November 26, 1980 of the Airborne Express Pilots' System Board of Adjustment. While the

---

1. Plaintiff also contends, inaccurately, that this Court found in its March 29 Opinion that Plaintiff had not been terminable at will due to the protections of the RLA. (Doc. # 84, at 3). In fact, this Court held that the 180-day "probationary period" was what brought that initial portion of Plaintiff's oral employment contract out of the employment at will doctrine due to the finite duration of that "probationary period." (Doc. # 69, at 19–20). *See Henkel,* 344 N.E.2d at 118.

avowed purpose of Defendant's board was to investigate and decide the appropriateness of Defendant's actions in disciplining or discharging pilots, Plaintiff Trial Exh. 39–3, the document establishing the board does not anywhere provide that the Defendant's ability to discharge was to be limited to discharges with cause. *Compare* Plaintiff Trial Exh. 7–D (March 25, 1983 Collective Bargaining Agreement between Teamsters and Defendant) (Art. IV, Sec. G(2): "A pilot shall ... be terminated for all purposes when [h]e is discharged for just cause."). As no collective bargaining agreement was in force at the time of Plaintiff's discharge, Plaintiff's position is that the RLA itself requires that pilots only be discharged for cause by ordering the creation of system boards of adjustment. (Doc. #79 at 3; Doc. #86 at 2–3). Plaintiff has not tendered any authority to support this position.

Congress extended the RLA to cover air carriers in 1936. 45 U.S.C. §§ 181–188. Its general aim in so doing was to extend to air carriers and their employees the same benefits and obligations which prevailed in the railroad industry. *International Ass'n of Machinists, AFL–CIO v. Central Airlines, Inc.*, 372 U.S. 682, 685, 83 S.Ct. 956, 958, 10 L.Ed.2d 67 (1963). Instead of immediately creating an airline equivalent to the National Railroad Adjustment Board, *see* 45 U.S.C. § 153, Congress required that system, group or regional boards of adjustment be established by air carriers. 45 U.S.C. § 184. These boards of adjustment were to have jurisdiction not exceeding that of the National Railroad Adjustment Board, *id.*, and the obligation of air carriers in creating such boards of adjustment was to be interpreted in light of the RLA and the history of that statute. *International Ass'n of Machinists*, 372 U.S. at 686–687, 83 S.Ct. at 959 (citation omitted).

With respect to both the National Railroad Adjustment Board and the airline boards of adjustment, Congress intended to ensure labor-management stability and an effective system of processing grievances and settling so-called "minor disputes."

*Id.* at 689–90, 83 S.Ct. at 960–61; *Union Pacific Railroad Co. v. Sheehan*, 439 U.S. 89, 94, 99 S.Ct. 399, 402, 58 L.Ed.2d 354 (1978). There is no indication in the decisions construing these systems for processing disputes that the establishing legislation was to provide, in addition to a mechanism for resolving disputes, a new substantive protection against discharge. In *Andrews v. Louisville & Nashville R. Co.*, 406 U.S. 320, 92 S.Ct. 1562, 32 L.Ed.2d 95 (1972), a discharged railroad employee sought to sue his employer in state court for wrongful discharge. The railroad protested, claiming that the employee had failed to invoke the Adjustment Board remedy provided to him by his employer in accordance with the RLA. The Supreme Court agreed with the railroad and observed:

> The fact that petitioner characterizes his claim as one for "wrongful discharge" does not save it from the Act's mandatory provisions for the processing of grievances. Petitioner argues that his election to sever his connection with the employer and treat the latter's alleged breach of the employment contract as a "discharge" renders his claim sufficiently different from the normal disputes over the interpretation of a collective-bargaining agreement to warrant carving out an exception to the otherwise mandatory rule for the submission of disputes to the Board. *But the very concept of "wrongful discharge" implies some sort of statutory or contractual standard that modifies the traditional common-law rule that a contract of employment is terminable by either party at will. Here it is conceded by all that the only source of petitioner's right not to be discharged, and therefore to treat an alleged discharge as a "wrongful" one that entitles him to damages, is the collective-bargaining agreement between the employer and the union.*

*Id.* at 324, 92 S.Ct. at 1565 (emphasis added). Thus, even though the petitioner was an employee covered by the RLA, with an adjustment board remedy available to him,

that in itself was not believed to limit his vulnerability to discharge under the employment at will doctrine.

In *Conrad v. Delta Airlines, Inc.*, 494 F.2d 914 (7th Cir.1974), plaintiff was a member of an air pilots' union, but the relevant collective bargaining agreement excluded newly-hired pilots such as plaintiff from the provisions of the agreement requiring investigation and a hearing prior to termination. *Id.* at 915. The *Conrad* court, after specifically noting that Plaintiff's discharge could have been presented to a system board of adjustment, held that the RLA does not, in the absence of another statute or agreement, itself require just cause for the discharge of airline employees covered by the RLA. *Id.* at 916 (citing *Russ v. Southern Railway Co.*, 334 F.2d 224, 228 (6th Cir.1964), *cert. denied*, 379 U.S. 991, 85 S.Ct. 699, 13 L.Ed.2d 611 (1965)). *See generally* MacIntyre, The Railway Labor Act—Airline Misfit, 19 Air L. and Comm.J. 274 (1952).

Such authority undermines Plaintiff's position that he would not have been terminable at will, had he returned to the line, due to the protections of the RLA. With respect to the authority submitted by Plaintiff with respect to his entitlement to back pay, none of it is sufficient to overcome the employment at will obstacle. The Court finds *Falls Stamping & Welding Co. v. Intern. Union*, 485 F.Supp. 1097 (N.D.Ohio 1979), cited by Plaintiff, distinguishable as it involved reinstatement and back pay pursuant to an arbitration award. Also inapposite to Plaintiff's claim for back pay is *Swisher v. Kimbrough*, 25 Ohio App. 233, 157 N.E. 823 (1927), as it involved damages only for the remainder of an employment contract of specific duration after breach by the defendant.

In summary, this Court is forced to conclude that, while Defendant repudiated Plaintiff's option to return to the line before the expiration of the "probationary period," Plaintiff remained employed at a higher chief pilot's salary for the remainder of the "probationary period." At the end of the "probationary period," Plaintiff would have been an employee at will, even if allowed to return to the line, and thus was subject to termination without cause at any time. As a result, only nominal damages of $1.00 are awarded to Plaintiff as a result of Defendant's breach.

### (B) *Reinstatement*

■ Plaintiff seeks reinstatement to Defendant's employ, asking that he be given a "reasonable requalifying period" of approximately three months in order to permit him to become qualified to serve as a DC–9 captain. (Tr. 1683, 1691–92, testimony of Podlesnick). Plaintiff recognizes the general rule that, under Ohio law, specific performance is not available to enforce the provisions of an employment contract for personal services. *Felch v. Findlay College*, 119 Ohio App. 357, 200 N.E.3d 353 (1963) (even if plaintiff, a college professor, could not be dismissed without cause, specific performance ordering his reinstatement not available as a remedy). Plaintiff contends that the equities of this particular case support the remedy of reinstatement. This Court cannot agree.

Citing *State ex rel. Wright v. Weyandt*, 50 Ohio St.2d 194, 363 N.E.2d 1387 (1977), Plaintiff contends that reinstatement to the line should be available due to the fact that damages are an inadequate remedy for his asserted right to return to the line. In *Wright*, however, the relators (plaintiffs) had been ordered reinstated to their Civil Service positions by the state Civil Service Commission. They then signed a settlement agreement in which they waived all claims against those officials responsible for their discharge in exchange for back pay and immediate reinstatement to their previous positions. Relators then sought to enforce the provisions of the release through a writ of mandamus. 50 Ohio St.2d at 195, 363 N.E.2d at 1388. The Supreme Court of Ohio found that, based on the policy in favor of settlement of litigation, the reinstatement called for in the settlement agreement, and the reinstatement which had been ordered by the state Civil Service Commission based on

Civil Service legislation, specific performance of the reinstatement position could be ordered despite the general rule against such relief in the personal service context. 50 Ohio St.2d at 199, 363 N.E.2d at 1391.

Plaintiff attempts to analogize the facts of the instant case to those which entitled the relators in *Wright* to reinstatement. Yet there is no settlement agreement in this case unambiguously providing for Plaintiff's reinstatement. Nor does a statutorily-created right to reinstatement, believed by the *Wright* court to outweigh the common law "lack of mutuality" objection to specific performance of personal service contracts, figure into this case. *See Masetta v. Foundry Co.*, 159 Ohio St. 306, 112 N.E.2d 15 (1953).

Plaintiff further attempts to distinguish the rule against specific performance enunciated in *Felch* by insisting that underlying loyalty and confidence remains between Plaintiff and Defendant despite the instant dispute. In *Felch,* the court had believed reinstatement to be undesirable on the ground that any such basis for a harmonious working relationship would have evaporated during the disputes which had arisen. 119 Ohio App. at 359, 200 N.E.2d at 355 (citing Restatement (Second) of Contracts § 379, Comment d). Plaintiff testified at trial, no doubt sincerely, that he would have no difficulty in returning to Defendant's employ and in working for Mike Kuli, Graham Dorland and others. (Tr. 1723–24, testimony of Podlesnick). Defendant, however, both in its briefs and at trial, strongly disagrees with Plaintiff's characterization of their relationship, and states that it does not feel that it could confidently restore Plaintiff to service as a line pilot. (Tr. 1750–52, testimony of Kuli; Doc. # 80 at 3). Defendant points out that Plaintiff is not qualified to fly any planes which it currently operates. Defendant also introduced testimony at trial detailing the costs which

it would incur in re-hiring Plaintiff and training him for the DC–9 position which he seeks. (Tr. 1739–40, testimony of Hete).[2]

The Court is less impressed with Defendant's position that, as an ex-management official, Plaintiff has possession of certain knowledge about Defendant which is typically not made available to line pilots. (Tr. 1751, testimony of Kuli). Obviously Defendant was willing to allow Plaintiff to return to the line after 180-days as a management official, and no testimony was introduced to the effect that, after the expiration of the 180-day period, Plaintiff was made privy to certain information to which he had previously not been exposed. While certainly the argument can be made that Plaintiff's exposure to management-type information increased as his length of service as chief pilot grew, that tenure was at least, in part, the product of Defendant's repudiation.

Even with this observation, the Court cannot find the factors in this case to be such as to override the general rule that a promise to render personal services will not be specifically enforced, regardless of which party seeks such enforcement. Restatement (Second) of Contracts § 367(1) (1979). As noted in Comment b to Section 367, the policies, outlined *supra,* against compelling an employer to retain an employee would not prevent this Court from ordering reinstatement had an anti-discrimination statute or collective bargaining agreement been violated. Such was not the case herein. Indeed, it is the very lack of the protections of a collective bargaining agreement which renders Plaintiff only entitled to nominal damages, given his status as an employee at will under either of the bargained-for options in his oral employment contract. Unfortunately, the harshness of the employment at will doctrine is best remedied by contractual agreements,

---

**2.** Although Defendant also introduced testimony as to the $10,600 in costs which it could incur were other employees "bumped back" to serve on other aircraft due to Plaintiff's reinstatement, no testimony was introduced to establish that such a "bump back" *would* in fact occur were Plaintiff to be reinstated as a DC–9 pilot. Defendant's witness, Mr. Hete, was instructed to assume a "bump back," and gave his assessment of the re-training costs of the "bump back" based on that assumption. (Tr. 1739–41, testimony of Hete).

rather than resort to the extraordinary remedy of specific performance.

### (C) *Punitive Damages*

Plaintiff presented no evidence at trial with respect to his request for punitive damages. At the hearing, Plaintiff's counsel stated the belief, with respect to punitive damages, that "there is adequate demonstration in the record relating to the motives of the company as it relates to the breach of Mr. Podlesnick's 180 [day] probationary period as chief pilot." (Tr. 1629). Plaintiff does not contest the authority cited by Defendant to the effect that punitive damages are not available for breach of contract under Ohio law, *Davis v. Tunison*, 168 Ohio St. 471, 155 N.E.2d 904 (1959), and that allegations of willful breach are insufficient to convert a contract action into one based in tort. *Tibbs v. National Homes Construction Corp.*, 52 Ohio App.2d 281, 369 N.E.2d 1218 (1977).

Plaintiff suggests that the circumstances of Plaintiff's dismissal by Defendant, which he explains to be the Defendant's anti-union activity and Plaintiff's refusal to engage in such activity, should serve as the basis for an award of punitive damages. (Doc. # 79 at 7; Doc. # 84 at 9). This Court specifically refused to make any findings as to Defendant's alleged anti-union activity, given Plaintiff's lack of standing as a management official to pursue relief under the RLA. (Doc. # 69 at 16). While there is some authority to the effect that an employee who is not represented by a union may recover punitive damages from his or her employer for violation of the RLA, *Brown v. World Airways, Inc.*, 539 F.Supp. 179 (S.D.N.Y.1982), this Court cannot accept that the same rationale could be stretched to support punitive damages for a management official who is outside the protection of the RLA itself, even had anti-union activity been found. Accordingly, no punitive damages are awarded to Plaintiff.

### IV. *Conclusion*

In summary, Plaintiff is awarded nominal damages in the sum of $1.00. Plaintiff's request for reinstatement is denied, and no punitive damages are awarded. Plaintiff having withdrawn his request for attorney's fees, no fees are awarded. Judgment is entered for Plaintiff in the amount of $1.00.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.