877 F.2d 400
 LIBERTY BANK and Its Successor in Interest, the Federal
Deposit Insurance Corp., Plaintiffs-Appellees
Cross-Appellants,
v.
TALMAN HOME MORTGAGE CORPORATION, Defendant
Talman Home Federal Savings & Loan Association,
Defendant-Appellant Cross-Appellee.
 No. 88-2633.
 United States Court of Appeals,
Fifth Circuit.
 July 18, 1989.
 
 Stephen W. Smith, James C. Slaughter, Houston, Tex., for defendant-appellant cross-appellee.
 William B. Allison, Geoffrey H. Bracken, Houston, Tex., for plaintiffs-appellees cross-appellants.
 Appeals from the United States District Court for the Southern District of Texas.
 Before THORNBERRY, WILLIAMS and DAVIS, Circuit Judges.
 JERRE S. WILLIAMS, Circuit Judge:
 
 
 1
 Talman Home Federal Savings & Loan Association appeals an adverse summary judgment requiring it to repurchase three mortgage loans as a remedy for its breach of a loan participation agreement with appellee Liberty Bank. We find that the district court incorrectly interpreted the loan participation agreement and as a result erred in ordering that the loans must be repurchased. We reverse the judgment of the district court, remanding the case for a determination of whether Liberty Bank already has been compensated completely in common law damages for Talman's breach of the Participation Agreement.
 
 I. Background
 A. The Agreement
 
 2
 On April 9, 1976, appellee Liberty Bank's predecessor-in-interest (Parmer Properties, Inc.) purchased a participation interest in several mortgage loans from appellant Talman Home Federal's predecessor-in-interest (Unity Savings Association).[1] These notes were secured by mortgage trust deeds and insured by the Federal Housing Administration. As amended in 1979, the Participation Agreement covered three notes: the Clifton Plaza note, the Warren Manor note, and the Merrifield Estates note.
 
 
 3
 Under the terms of the amended Participation Agreement, Liberty Bank acquired a 97% interest in the Clifton and Warren Manor notes, and a 93.887% interest in the Merrifield Estate note. Liberty Bank's participation interest, still in effect, entitles it to a proportionate share in the proceeds of the payments made on the underlying loans. Talman Federal retains the loans in its name and collects the monthly payments from the mortgage loan debtors on the 1st of each month. On the 25th of each month, Talman is required to wire transfer to Liberty Bank an amount equal to Liberty's proportionate share in the note payments, minus a service fee retained by Talman.
 
 
 4
 Talman Federal's obligation to make the participation payments to Liberty Bank is expressly conditioned on Talman's collection of the installments from the mortgage debtors. Paragraph 2 of the Participation Agreement states:
 
 
 5
 ... In the event of default by any mortgage loan debtor in the payment of the principal or interest to Seller [Talman] on any participated loan, then as to such loan Seller shall not be required to remit principal or interest until collected from the mortgage loan debtor. The representations or warranties herein above described or otherwise contained in this Agreement shall in no event be construed as a warranty or guarantee by Seller as to future payments by mortgage debtors and the sale of a participating interest by Seller to Purchaser [Liberty] pursuant to this Agreement, shall be without recourse.
 
 
 6
 The central disputed issue on appeal is the proper interpretation of Paragraph 10 of the Participation Agreement. This clause reads, in relevant part:
 
 
 7
 In case of default in the payment of any note, or the covenants of any mortgage or trust deed securing such note after the issuance by Seller of any Participation Certificate covering such note as provided herein, the Seller shall, within Thirty (30) days from the date of said default, at its option, either (i) repurchase Purchaser's participation interest in said note for an amount equal to the unpaid balance of principal, plus accrued interest, owing on said defaulted note to date of repurchase or (ii) replace the said Participation Certificate with a Participation Certificate covering an equal amount in dollars in other Seven Percent (7.0%) to Eight Percent (8.0%) promissory notes of equal standing and dignity with the note(s) being replaced so that Purchaser shall receive a return of interest equal to that set out hereinabove, ... Provided however, the option to replace a note shall expire Ten (10) years after date hereof, and thereafter Seller must repurchase any loan remaining in default for Thirty (30) days or more.
 
 
 8
 Liberty Bank contends that this paragraph provides a remedy for any breach of the payment terms of the Participation Agreement by Talman. Talman argues that the provision is an alternative promise by Talman that is triggered only when an underlying mortgage loan is in default.
 
 
 9
 B. Late and Incorrect Participation Payments
 
 1. The Clifton Note
 
 10
 On several occasions in 1983 and 1984, Talman failed to remit participation payments to Liberty on time. All of the late payments were on the Clifton note. Most of the late payments were due to accounting errors, lost checks, and the like. Talman claimed, for example, that the June 1983 payment from Clifton was misapplied, and that the July, 1983 check from Clifton was lost in the mail. Liberty did not receive its participation payments for these months until August 24, 1983. Similarly, the November and December, 1983 participation payments were not tendered to Liberty until January 11, 1984. Talman admitted that it had erred in failing to apply the November payment to Liberty's account, and that it had been delayed in processing the December payment.
 
 
 11
 In January, 1984, however, it was a default by the Clifton mortgage loan debtor that caused a delay in Liberty's receipt of its participation payment from Talman.[2] On February 1, 1984, Talman wrote the Department of Housing and Urban Development, declaring that the Clifton note was in default. On February 14, 1984, the Clifton debtor tendered the overdue January payment to Talman. In March, 1984, Liberty agreed to accept the November, December, and January participation payments due for the Clifton note under a Reservation of Rights agreement.
 
 
 12
 In sum, in the summer and fall of 1984, Talman was late four times in tendering to Liberty its participation payments on the Clifton note. Various reasons were given for these delays, but the mortgage loan debtor was not in default. In January, 1984, the Clifton mortgage debtor was in default. But the January participation payment, along with all the other late payments, was ultimately received by Liberty. Since that time, all subsequent participation payments for the Clifton note have been remitted to Liberty in a timely manner.
 
 2. Failure to Pay Stepped-Up Interest
 
 13
 The Participation Agreement guarantees a 6 percent net interest return to Liberty on all participated loans for the first 10 years of the Agreement, regardless of the interest actually charged or collected by Talman. This rate was to increase to 7 percent in April, 1986. Talman did not pay the stepped-up interest rate for almost a year after it was due, despite requests from Liberty. In March, 1987, however, Talman paid Liberty $33,198.56, representing the 1 percentage interest shortfall for the period in question. Liberty accepted the payment under its Reservation of Rights agreement. Talman continues to pay 7 percent interest to Liberty.
 
 C. Prior Proceedings
 
 14
 Liberty Bank filed suit against Talman in Texas state court on March 1, 1984, alleging that Talman had breached the Participation Agreement by making late payments on the Clifton note. Liberty contended that Talman was required by the contract to repurchase the Clifton note as a remedy for its breach. Talman immediately removed the case to federal district court on diversity of jurisdiction grounds.[3] On April 8, 1986, Liberty moved for summary judgment. Liberty later filed a supplemental motion for summary judgment, arguing that Talman's failure to pay the stepped-up interest rate when due also was a breach of the Participation Agreement and required repurchase of all three underlying notes.
 
 
 15
 The district court granted both summary judgment motions. The court concluded that the late payments on the Clifton note and the failure to pay stepped-up interest were breaches of the Participation Agreement. The court decided that Paragraph 10 of the Agreement provided the remedy for these breaches, and ruled that Talman's option to replace the notes under this paragraph had expired. Talman was ordered to repurchase the Clifton, Warren Manor, and Merrifield Estate notes for $3,651,198.02, which represented Liberty Bank's total outstanding share of the three notes as of August, 1987.[4]
 
 
 16
 Liberty sought to recover equitable prejudgment interest at a rate of 10 percent. The district court held that a Texas statutory rate of 6 percent applied. Because Talman had already paid Liberty interest in excess of that amount, no prejudgment interest was awarded.
 
 
 17
 The court ordered entry of final judgment, and its ruling was certified for appeal pursuant to Fed.R.Civ.P. 54(b).[5] Talman appeals the adverse summary judgment. Liberty cross appeals, contesting the failure to award 10 percent prejudgment interest.
 
 II. Interpretation of the Contract
 
 18
 Talman concedes that it was late in making participation payments on the Clifton note to Liberty, and that at least one of these delays was due to a default by the Clifton mortgage loan debtor. Talman also admits that it failed to pay the stepped-up interest rate when due. Talman contends, however, that the district court erred in ruling that these acts were breaches of the Participation Agreement that required Talman to repurchase all three loans under Paragraph 10 of that contract. This is a question of contract interpretation, which is an issue of law to be determined by the court.[6] Because this is a legal issue, we review the case de novo. City of Austin v. Decker Coal Co., 701 F.2d 420, 425 (5th Cir.), cert. denied, 464 U.S. 938, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983).
 
 
 19
 Paragraph 10 of the Participation Agreement states that Talman's obligation to replace or repurchase a participated loan arises "[i]n case of default in the payment of any note." We must determine what the parties intended by choosing this phrase. We ascertain this intent by looking to the language of the contract, considering the instrument in its entirety. Harris v. Rowe, 593 S.W.2d 303, 306 (Tex.1979); United States Steel v. Whitley, 636 S.W.2d 465, 469 (Tex.App.--Corpus Christi 1982, writ ref'd n.r.e.).
 
 
 20
 Talman argues that the term "note" in the first sentence of Paragraph 10 refers to the mortgage loan notes underlying the Participation Agreement. According to Talman, only a default in payment by a mortgage loan debtor triggers the repurchase or replace obligation of Paragraph 10. Liberty contends that a "default in the payment of any note" includes any late or incorrect participation payments made by Talman to Liberty. In short, Liberty maintains that any breach by Talman of the payment terms of the Participation Agreement obligates Talman to repurchase or replace the mortgage loans. The district court adopted Liberty's interpretation.
 
 
 21
 The Participation Agreement does not define the term "note." Elsewhere in the agreement, however, the parties use the term "Promissory Note" to refer to the obligation of the mortgage loan debtors, and the phrase "this Agreement" to refer to the Participation Agreement. Given this context, it seems likely that the term "note" in the first sentence of Paragraph 10 is shorthand for the mortgage loans, and does not refer to Talman's obligations under the Participation Agreement.
 
 
 22
 A closer look at Paragraph 10 converts likelihood to reasonable certainty. The paragraph begins by stating that a "default in the payment of any note" triggers Talman's obligation to repurchase or replace the mortgage loans. The term "note" then reappears in the following phrases in the same paragraph: "any mortgage or trust deed securing such note"; "any Participation Certificate covering such note"; the "Purchaser's participation interest in said note"; and the "balance of principal owing on such defaulted note." (emphasis added) In each of these phrases, the word "note" clearly refers to the underlying mortgage loans. The word "note" never appears in the Participation Agreement to describe any obligation owed by Talman to Liberty. In view of this consistent usage, we hold that the term "note" in the first sentence of Paragraph 10 likewise must refer to the mortgage loans.
 
 
 23
 Liberty argues that even under this interpretation of the word "note," Talman must still repurchase or replace the mortgage loans when it breaches the payment terms of the Participation Agreement. According to Liberty, the participation payments made under the Participation Agreement are in fact payments on the underlying notes, so that any breach of the payment terms of the Agreement constitutes a "default in the payment of any note" under Paragraph 10.
 
 
 24
 This broad interpretation, however, ignores the fact that Liberty Bank is not a party to the underlying mortgage loans. The payments it receives are governed solely by the terms of the Participation Agreement. The amount of interest that Talman must pay Liberty, for example, is completely unaffected by the interest charged on the underlying loan. In short, we have separate agreements: (1) the mortgage debtors are obligated to Talman under the mortgage loans, and (2) Talman is obligated to Liberty under the Participation Agreement. It is wrong to equate a participation payment made under the Participation Agreement with a payment on an underlying note, as Liberty attempts to do. Talman's obligations to Liberty are not created or controlled by the mortgage loans.
 
 
 25
 This distinction between Talman's duty to pay Liberty in accordance with the terms of the Participation Agreement and the obligations of the mortgage loan debtors is underscored by Paragraph 2 of the Participation Agreement. That provision explains that Talman's obligation to pay Liberty under the Agreement is conditioned on Talman's collection of payment from the mortgage loan debtor. A default on the underlying note, then, suspends Talman's obligation to make participation payments to Liberty. Talman does not breach the Participation Agreement by failing to make payments to Liberty when loan default occurs. This provision makes clear that a "default in the payment of any note," which we have construed to mean a default on the underlying mortgage loan, is not synonymous with breach of the payment terms of the Participation Agreement.
 
 
 26
 We hold that "a default in the payment of any note" in Paragraph 10 refers to a default by the mortgage loan debtor on the underlying loan. We rely on the fact that the parties use the term "Promissory Note" and "note" elsewhere in the agreement to refer to the underlying mortgage loans. In Paragraph 2 of the contract, moreover, the parties make clear that Talman's obligations to Liberty under the Participation Agreement are distinct and independent from the obligations created by the mortgage loans. Indeed, there is no legal relationship whatsoever between Liberty and the mortgage loan debtors. Thus, in choosing the phrase "default in the payment of any note" to trigger Talman's obligation to repurchase or replace the loans, the parties provided protection for the purchaser, Liberty Bank, in precisely the area where it would otherwise have no recourse--a default by a mortgage loan debtor.
 
 III. Legal Effect of the Contract
 
 27
 Our holding mandates a complete shift from the analysis advocated by Liberty Bank and adopted by the district court. Paragraph 10 is not, as the district court held, a remedy for any breach of the payment terms of the Participation Agreement. Instead, Paragraph 10 is properly construed as an alternative promise by Talman to replace or repurchase a mortgage loan, at its option, upon default of that loan by the mortgage loan debtor. See 5A A. Corbin, Corbin on Contracts, Sec. 1213, at 435 (1964) ("the parties may clearly indicate that the contract is an alternative one, giving the promisor an option between two performances.")
 
 
 28
 Under this interpretation, the district court erred in granting the supplemental summary judgment ordering Talman to repurchase the Warren Manor and Merrifield Estates notes because of Talman's failure to pay the stepped-up interest rate. While Talman's initial failure to pay the proper rate was a breach of the Participation Agreement, it was not occasioned by a default of the mortgage loan debtor. Paragraph 10 does not provide a remedy for this breach; Liberty's remedy is in common law damages.[7]
 
 
 29
 In contrast to the other defaults by Talman itself under the Participation Agreement, Paragraph 10 was activated by the default of the Clifton mortgage debtor in January, 1984. The lower court concluded that Talman was required to repurchase the Clifton note on account of this default under the terms of Paragraph 10 because the option to replace the note had expired. Liberty offers two theories to support the district court's order: (1) the option to replace had expired under the terms of Paragraph 10 because ten years had passed, or (2) the option to replace was forfeited because Talman failed to elect to replace the note within 30 days. We address these contentions in turn.
 
 
 30
 The final clause in Paragraph 10 expressly limits Talman's replacement option, stating: "[p]rovided however, the option to replace a note shall expire Ten (10) years after date hereof, and thereafter Seller must repurchase any loan remaining in default for thirty (30) days or more." The ten-year anniversary date of the Participation Agreement was April 9, 1986. Because this date had passed by the time the district court entered summary judgment, it ordered Talman to repurchase the Clifton mortgage loan.
 
 
 31
 The ten-year expiration date on Talman's option to replace a defaulted note destroyed the alternative nature of the contract as of April 9, 1986. See 5 Corbin on Contracts Sec. 1085. The Clifton loan default, however, occurred in January, 1984, during the time that Talman could exercise its right of replacement. Nothing in the language of the contract suggests that Talman's option was destroyed when the Clifton default occurred within the ten-year option period. Here Talman chose to contest the fact of default in court, thus suffering the delays of litigation. We decline to adopt an interpretation that eliminates the option on a default occurring before the ten-year option period expired. We conclude that it is clear from the language of Paragraph 10 that the parties intended to allow Talman to choose the replacement option for any mortgage loan default that occurred before April 9, 1986.[8] The Clifton note default falls into this category. We hold that the district court erred in deciding that Talman lost its replacement option because the ten-year expiration period was reached during the pendency of this litigation.
 
 
 32
 Paragraph 10 also provides that within the ten-year option period Talman was required to exercise the option to replace or repurchase a defaulted note "within thirty days from the date of said default." Liberty contends that Talman relinquished its replacement option by failing to make an election within the thirty day period. In support of this proposition, however, Liberty relies on a lone case where the contract in question expressly provided that the promisor forfeited one of the alternatives in the contract by failing to elect that option within a certain time period. Gladys City Co. v. Amoco Production Co., 528 F.Supp. 624, 629 n. 5 (E.D.Tex.1981).[9] Paragraph 10 contains no such provision.
 
 
 33
 Liberty also relies on an 1849 case, Hemming v. Zimmerschitte, to support its contention that Talman forfeited its right to replace the defaulted note by failing to elect this option within thirty days. 4 Tex. 159 (1849). The Hemming court suggested in dicta that the options embodied in an alternative contract are lost if election is not made within the period provided for in the contract. 4 Tex. at 164. This statement does not, however, support Liberty's contention that only one alternative (the replacement option) is relinquished by Talman's failure to make a timely election, while the second option (the repurchase provision) becomes mandatory.
 
 
 34
 The only way to reach this result, in the absence of specific contractual language, is to conclude that the choice between the two options devolves to Liberty upon Talman's failure to make an election. This has to be the implicit assumption of Liberty's argument. But Liberty cites no cases to support this proposition. Indeed, the commentators have uniformly rejected it. See 11 S. Williston, A Treatise on the Law of Contracts Sec. 1407, at 594-96 (3d ed. 1968); 5 Corbin on Contracts Sec. 1087, at 477.
 
 
 35
 Thus, there is no substantial support for Liberty's contention that the option to replace the defaulted note was forfeited and the option to repurchase the loan became mandatory because Talman failed to elect either option within thirty days. Admittedly a breach of contract occurred by Talman's failure to elect in thirty days, but the issue must be damages for the breach, not damages based upon Liberty's choice of the options.
 
 
 36
 We conclude that the district court erred in ordering Talman to repurchase the Clifton note. At the time of the Clifton note default, Talman had the option to replace the loan. The replacement right was not lost by Talman because the expiration date was reached during the pendency of this litigation. Moreover, Talman's failure to repurchase or replace the defaulted loan within thirty days did not cause it to forfeit the replacement option.
 
 IV. Damages
 
 37
 Talman's failure to repurchase or replace the Clifton note within thirty days was, as stated above, a breach of the Participation Agreement. Liberty's remedy is in common law damages. When the breaching party had the option of choosing between two alternatives at the time of breach, "the measure of damages is the loss caused by reason of the promisor failing to perform the promise with the lesser value." Stewart v. Cran-Vela Rental Co., 510 F.2d 982, 986 (5th Cir.1975). See also Restatement of Contracts Sec. 344 (1932), cited with approval in Arlington Indep. School Dist. v. James T. Taylor & Son, 322 S.W.2d 548, 551 (Tex.Civ.App.--Fort Worth 1958), aff'd, 160 Tex. 617, 335 S.W.2d 371 (1960); 11 Williston on Contracts Sec. 1407; 5 Corbin on Contracts Sec. 1079.[10] In this case, replacement of the Clifton note with a loan of equal value was the less onerous alternative available to Talman. The damages for breach of Talman's alternative promise is the difference between what Liberty would have received if the Clifton loan had been replaced and what Liberty did receive in payments on the Clifton note.
 
 
 38
 Talman contends that Liberty has already collected everything it would have received if the Clifton note had been replaced. Talman asserts that Liberty has now been completely compensated for late payments on the Clifton loan and Talman's failure to pay the stepped-up interest rate when due, noting that it had paid Liberty $33,198.56 in March, 1987 to make up for the interest shortfall. Further, since the January 1984 default, participation payments to Liberty on the Clifton note have been paid on schedule.
 
 
 39
 The parties have focused their attention in this appeal on whether or not the mortgage loans must be repurchased as a remedy for Talman's breaches of the Participation Agreement. The question of what amount of damages should be awarded under common law measures has not been addressed. Thus, the record on appeal does not provide sufficient information for us to resolve this question. For example, Liberty must be afforded the opportunity to contest Talman's assertion that Liberty has collected everything it would have received if the Clifton note had been replaced upon default. Further, the Reservation of Rights agreement under which Liberty accepted the interest shortfall payment is not part of the record on appeal. We do not know if the parties have agreed that the $33,198.56 payment was complete compensation for Talman's initial failure to pay the interest rate, or if Liberty disputes this amount.
 
 
 40
 The question of full recompense must, therefore, be resolved by the district court. Accordingly, we remand the case for the district court to determine whether Liberty has been completely compensated an amount equal to common law damages for Talman's two breaches of the Participation Agreement.
 
 
 41
 Relating to the damage issue, one final legal issue remains. Liberty cross appeals the district court's refusal to award prejudgment interest at a 10 percent rate. The court determined that the 6 percent rate applied under Texas Rev.Civ.Stat.Ann. art. 5069-1.03 (Vernon 1987).[11]
 
 
 42
 In Lubrizol Corp. v. Cardinal Construction Co., 868 F.2d 767 (5th Cir.1989), this Court recognized that "[p]rejudgment interest rates in Texas have had a checkered history," creating some confusion as to the proper award in breach of contract cases. 868 F.2d at 771. We concluded in Lubrizol, however, that recent decisions of the Texas appellate courts make clear that the 6 percent interest rate provided for in Article 5069-1.03 applies in breach of contract cases when the damages are ascertainable from the contract. Id. at 771-72.
 
 
 43
 The court below determined that damages were ascertainable under the Participation Agreement between Liberty and Talman because the contract specified the terms under which Talman must repurchase Liberty's interest in the underlying loans. The court then applied the correct analysis to determine the rate of prejudgment interest under our Lubrizol opinion. But it used the wrong measure of damages as its starting point since we have concluded that it erred in ordering that the loans must be repurchased. On remand, the court must award the proper prejudgment interest using the common law damages as its basis, but determining also if these damages are ascertainable from the contract under Texas law as required by Lubrizol.
 
 V. Conclusion
 
 44
 Paragraph 10 of the Participation Agreement provides that Talman must replace or repurchase the notes made subject to the Agreement "in case of default in the payment of any note." The lower court erred in concluding that this provision provided a remedy for Talman's breach of the payment terms of the Participation Agreement. Instead, by choosing this language, the parties intended for the replace or repurchase obligation to be triggered upon default by a mortgage loan debtor on an underlying loan. Liberty's only remedy for Talman's own defaults consisting of delayed participation payments and incorrect interest payments is in common law damages for breach of contract.
 
 
 45
 The district court also erred in ordering Talman to repurchase the Clifton loan, which was in default in January, 1984. At the time of default, Talman clearly had the option to repurchase or replace the defaulted loan. Since there is no contract provision for ascertaining damages, the common law measure of damages also applies for this breach by Talman in not exercising this alternative obligation. Talman must compensate Liberty only for what Liberty would have received under the less expensive alternative. In this case, it appears the replacement option was the less onerous choice. The case is remanded for the district court to determine if Liberty has been completely compensated in common law damages for Talman's breaches of the Participation Agreement. The lower court must also decide the proper prejudgment interest rate under Texas law for these common law damages, if any.
 
 
 46
 REVERSED AND REMANDED.
 
 
 
 [1]
 During the pendency of this litigation, the Federal Deposit Insurance Corporation substituted into the lawsuit as the successor to Liberty Bank. For clarity and consistency, we will refer to the appellee as "Liberty" or "Liberty Bank" throughout the opinion
 The parties do not dispute that they are the successors to the initial signatories of the agreement, and are bound by the terms of the original contract. As used in the Participation Agreement, the term "Seller" now refers to appellant Talman Home Federal and the term "Purchaser" refers to Liberty Bank.
 
 
 [2]
 In the court below, Talman argued that the failure of the Clifton loan debtor to make its January payment was not a "default" under the Participation Agreement. The district court rejected this contention, concluding that under the language of the contract there was, as a matter of law, a default by the mortgage loan debtor in January, 1984. Talman has abandoned on appeal its argument that there was no default on the Clifton loan
 
 
 [3]
 Talman Home Federal is an Illinois corporation; Liberty Bank is organized under the laws of Texas and has its principal place of business in Houston. Paragraph 12 of the Participation Agreement states that the terms of the contract and the rights of the parties shall be construed under Illinois law. While we find no written modification of this term in the record, each party now argues that it should prevail under Texas law. Neither side contends that Illinois law applies. Because the parties have manifested their clear intent to have Texas law control, and because this issue was not raised in the court below, we apply Texas law
 
 
 [4]
 The district court granted Liberty's initial summary judgment motion on March 30, 1987. This ruling was limited to Talman's late payments on the Clifton mortgage loan. The court granted Liberty's supplemental summary judgment motion on April 29, 1987. The second ruling addressed Talman's failure to pay the stepped-up interest rate on all three mortgage loans when due. The court consolidated its rulings for the purpose of awarding damages
 
 
 [5]
 The court entered one final judgment, consolidating its two summary judgment rulings. See supra note 4. A Texas Deceptive Trade Practices Act claim remains before the district court
 
 
 [6]
 "Where, as here, neither party has alleged that the contract is vague or ambiguous, the construction of the contract is a question of law for the court." Pitts v. Ashcraft, 586 S.W.2d 685, 693 (Tex.Civ.App.--Corpus Christi 1979, writ ref'd n.r.e.) (citing City of Pinehurst v. Spooner Addition Water Co., 432 S.W.2d 515, 518 (Tex.1968))
 
 
 [7]
 The common law measure of damages for breach of contract is the difference between what the plaintiff would have received if there had been no breach and what the plaintiff actually did receive. See Stewart v. Basey, 150 Tex. 666, 245 S.W.2d 484, 486 (1952) (measure of damages is just compensation for loss actually sustained); Smith v. Kinslow, 598 S.W.2d 910, 912 (Tex.Civ.App.--Dallas 1980, no writ). As discussed infra, section IV, we remand the case for a determination of whether Liberty has been completely compensated in common law damages for this breach by Talman's $33,198.56 payment in March, 1987
 
 
 [8]
 Paragraph 10 states "thereafter [i.e., after April 9, 1986] Seller must repurchase any loan remaining in default for Thirty (30) days or more." (emphasis added). Neither the Clifton note nor any other note remained in default after April, 1986
 
 
 [9]
 In Gladys City, the contract in question provided that an oil and gas lessee had ninety days from the date of discovery of other valuable minerals to elect to exploit these minerals. Failure to make such election forfeited this right. The district court relied on this express forfeiture provision in holding that the lessee had lost its right to mine salt in the leased area. 528 F.Supp. at 629, n. 5
 
 
 [10]
 The rationale for this rule is simple: the promisor is held liable only for the cost of the least expensive alternative he could have chosen "as a recognition of the flexibility which had been bargained for by the party in breach." Podlesnick v. Airborne Express, Inc., 627 F.Supp. 1113, 1116 (S.D.Ohio 1986), aff'd, 836 F.2d 550 (6th Cir.1987)
 
 
 [11]
 Article 5069-1.03 provides:
 When no specified rate of interest is agreed upon by the parties, interest at the rate of six percent per annum shall be allowed on all accounts and contracts ascertaining the sum payable, commencing on the thirtieth (30) day from and after the time when the sum is due and payable.