Daniel KOBY, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 99–317C.

United States Court of Federal Claims.

Aug. 29, 2002.

Thomas R. Lamons, Santa Ana, California, and Arthur A. Oshiro, Saavedra & Zufelt, Long Beach, California, counsel for plaintiff.

Kyle Chadwick, U.S. Department of Justice, Washington, D.C., with whom was Assistant Attorney General Robert D. McCallum, Jr., for defendant.

## OPINION

ALLEGRA, Judge.

This contract case is before the court after trial in Pasadena, California. Previously, this court ruled that the Internal Revenue Service (IRS) breached a contract with plaintiff when it voided the sale of property it had seized from another individual for the payment of taxes. *See Koby v. United States,* 47 Fed.Cl. 99 (2000). At issue here is defendant's affirmative defense that plaintiff failed properly to mitigate the damages incurred following this breach. The parties have also presented legal arguments anticipating plaintiff's damage theories, in an effort to streamline proof should a future trial on damages prove necessary. After careful consideration of the evidence presented at trial, as well as the parties' pretrial filings and post-trial briefs, the court finds that defendant's mitigation claim is not well-taken. The court also concludes that plaintiff's damage theories all pass preliminary muster, with their ultimate viability and dollar impact dependent on facts yet to be developed.

## I. FACTS [1]

On March 25, 1997, the Internal Revenue Service ("IRS") seized a 20–unit apartment complex located in Oceanside, California (the "Oceanside property") due to the nonpayment of internal revenue taxes by the property's owner, Ronald D. Bachrach. That same day, the IRS issued a Notice of Public Auction Sale, which stated that on April 30, 1997, the Oceanside property would be sold at public auction pursuant to section 6335 of the Internal Revenue Code of 1986, 26 U.S.C. § 6335 (1994). The revenue officer responsible for the seizure and sale of the Oceanside property was Michael Rude, a twenty-year veteran of the IRS. Following IRS procedure, Mr. Rude prepared for the auction by completing a minimum bid worksheet on the

---

1. Additional facts concerning the breach of contract here may be found in this court's earlier opinion, 47 Fed.Cl. at 100–02, and are incorporated herein by reference.

property. That worksheet established the minimum acceptable price for sale, a price that incorporated Mr. Rude's assessment of the market value of the property, discounted to reflect the circumstances of the forced sale and any prior encumbrances.

In determining the market value of the property, Mr. Rude considered its location, condition and potential rental income stream. His assessment relied heavily on his personal judgment of the physical appearance of the property, which he based on a site visit. According to his testimony, he found the complex to be "run down" with "trash everywhere" and significant deferred maintenance. It was also located in an area he considered to be "very poor" with "high crime." The minimum bid worksheet prepared for the April 30th auction listed the value of the property as $300,000, with a corresponding minimum bid of $30,549.

Before the auction, Mr. Rude made several announcements to the thirteen assembled bidders. Critically, he indicated that the IRS had complied with all of the required procedures, including notifying Mr. Bachrach, the taxpayer-owner. He also reminded the bidders that the taxpayer had a statutory right to redeem the property within 180 days of the sale and, therefore, warned the successful bidder not to expend money on the property during that period. Daniel Koby was the successful bidder at the April 30th auction, proffering $171,000 for the Oceanside property. Mr. Koby marshaled the funds to purchase the property by borrowing against his assets, drawing from personal savings, and partnering with his brother, Alan Koby, who sold stocks and secured an advance on his credit card in order to contribute money to the venture.

Soon after the sale, Mr. Koby felt compelled to address what he considered to be significant safety and health hazards on the property. These included such things as trash and dangerous debris in common areas, faulty wiring, leaky plumbing and defective venting, as well as various security problems (e.g., broken exterior lights). At trial, he testified that he believed that, under California law, he was obligated immediately to remedy these conditions, rather than awaiting the October 29, 1997, expiration of the taxpayer redemption period.

On June 27, 1997, the IRS determined that Mr. Rude had not provided proper statutory notice of the sale to Mr. Bachrach, as required by 26 U.S.C. § 6335(b); in fact, Mr. Bachrach had not received notice of the April 30th sale of his property until May 14, 1997. Accordingly, the IRS made arrangements to void the April 30th sale to Mr. Koby and to reseize and resell the property. On July 15, 1997, Mr. Rude completed the new seizure documents and on July 16, 1997, he scheduled the second public auction of the Oceanside property for August 29, 1997. Also on July 16, 1997, Mr. Rude left a telephone message with Mr. Koby requesting a meeting. This cryptic voice mail message was Mr. Koby's first indication that something had gone awry with the April 30th sale.

Concerned and a little agitated, Mr. Koby appeared at Mr. Rude's office on July 17, 1997, where Mr. Rude informed him that the IRS was canceling the April 30th sale and that the property would be reseized and resold. Mr. Koby refused to accept Mr. Rude's offer of a Treasury check refunding his $171,000 purchase price. Embarrassed by his failure to comply with proper procedure, Mr. Rude did not tell Mr. Koby the real reason for the cancellation or the defects in the first sale—indeed, as corroborated by several witnesses, rather than revealing that notice to the taxpayer had not been sent at all, Mr. Rude told plaintiff that the problem was that Mr. Bachrach was insisting upon personal service.[2] Mr. Koby threatened to

2. At trial, Mr. Rude intimated that he may have *provided Mr. Koby with more details regarding* why the first sale actually was canceled. He also suggested that he was even more specific with Mr. Koby's attorney. This testimony, however, was controverted by plaintiff's witnesses and flatly *inconsistent with Mr. Rude's earlier deposition* testimony (given only a couple of months earlier) at which he indicated that he provided no specif-

ic details either to Mr. Koby or his attorney. At *that deposition, for example, Mr. Rude, when* asked whether he had informed Mr. Koby of the reasons for the cancellation and new auction, stated:

No, I mean, obviously, it was embarrassing for me to make such a mistake. I mean, I was

sue for breach of contract and requested a meeting with IRS legal counsel to resolve the matter. No such meeting was held prior to the second auction. On July 18, 1997, Mr. Rude mailed Mr. Koby the refund check he refused to accept at their meeting. Acting on the advice of Mr. Cruz Saavedra, his attorney, Mr. Koby did not cash that check until November 12, 1997, two weeks after the expiration of the taxpayer redemption period for the first sale.

Meanwhile, prior to the second auction, Mr. Rude revised the minimum bid worksheet for the Oceanside property. The revised worksheet listed the value of the property at $450,000 with a minimum bid price of $120,549, nearly four times the minimum bid at the first auction. Despite repeated requests by both Mr. Koby and Mr. Saavedra, the IRS, prior to the August 29th auction, left plaintiff in the dark as to its reason for canceling the first sale or its rationale for revising the minimum bid. On August 22, 1997, Mr. Koby filed a quiet title action in California state court naming as defendants Mr. Bachrach and a "John Doe" (a placeholder for the successful bidder at the second auction).

On August 29, 1997, the Oceanside property was again sold at public auction, this time to Thomas McNamara for $155,000. Mr. McNamara had participated unsuccessfully in the first auction. There were only three registered bidders at the second auction, all of whom were informed of Mr. Koby's pending state court action. Acting on the advice of counsel, Mr. Koby attended the auction, but did not participate in it. Indeed, he uncontrovertedly testified that he would not have had adequate funds to participate without cashing the IRS's refund check from the first sale. The taxpayer redemption period following the second sale expired February 25, 1998. On February 24, 1998, Mr. Bachrach reclaimed the property by paying the redemption price of $172,287.65. Following

this redemption, Mr. Koby voluntarily dismissed his quiet title action.

On May 18, 1999, Mr. Koby filed suit in this court seeking damages from the government for breach of the sales contract established by the April 30, 1997, auction. In an opinion issued on the parties' cross motions for summary judgment, the court determined that the government's conduct constituted a breach of an enforceable contract. *See Koby v. United States,* 47 Fed.Cl. 99 (2000). Trial regarding the factual underpinnings of defendant's mitigation defense was held in Pasadena, California on October 22–23, 2001. Post-trial briefing was completed on February 26, 2002. Those briefs also presented various legal issues concerning plaintiff's damage theories.

## II. DISCUSSION

Two key issues must be resolved here. The first involves defendant's asserted mitigation defense; the second concerns the propriety, as a matter of law, of various of plaintiff's asserted theories of damages. The court will consider these matters *seriatim.*

### A. Failure to Mitigate

Defendant's centerpiece contention is that by not participating in the second auction, Mr. Koby failed to mitigate his damages, thereby significantly limiting the amount he can recover. To a certain extent, but not entirely, this argument presupposes that, because the sale price of the property was $16,000 less at the second auction, Mr. Koby would have handily won the property a second time had he simply bid using the monies refunded from the first sale. For the reasons stated, the court finds these contentions not well-taken.

 There is no dispute over the basic legal principles here—a non-breaching party generally may not recover damages attributable to that party's failure to take reason-

---

pretty vague with him because I obviously was embarrassed about making a mistake.
Mr. Rude gave similar deposition testimony regarding his conversations with Mr. Koby's attorney. When asked why his recollection had improved at trial, Mr. Rude responded that his memory had been refreshed, in part, by review-

ing his case history. Yet, when pressed by plaintiff's counsel, he could not identify any entries in that history that might conceivably have served this restorative purpose. This court finds Mr. Rude's fuzzy trial testimony incredible and credits, instead, his clearer deposition testimony.

able, non-burdensome steps to avoid its loss. Damages that the plaintiff might have "avoided without undue risk, burden or humiliation" are hence not recoverable. Restatement (Second) of Contracts § 350 (1981); *see also Middleton v. United States,* 175 Ct.Cl. 786, 792, 1966 WL 8875 (1966); *Sun Cal, Inc. v. United States,* 25 Cl.Ct. 426, 432 (1992). Application of this principle requires the court to consider whether a reasonable person, acting in light of the known facts and circumstances, would have taken steps to avoid certain damages. As stated by the Third Circuit:

> Whether or not the buyer's obligation to mitigate damages has been discharged depends on the reasonableness of its conduct. In this connection, reasonable conduct is to be determined from all the facts and circumstances of each case, and must be judged in the light of one viewing the situation at the time the problem was presented. Where a choice has been required between two reasonable courses, the person whose wrong forced the choice can not complain that one rather than the other was chosen.

*In re Kellett Aircraft Corp.,* 186 F.2d 197, 198 (3rd Cir.1950); *see also Beckman Cotton Co. v. First Nat'l Bank of Atlanta,* 666 F.2d 181, 184 (5th Cir.1982); *Tampa Electric Co. v. Nashville Coal Co.,* 214 F.Supp. 647, 652 (M.D.Tenn.1963). "The rule of mitigation of damages may not be invoked by a contract breaker as a basis for hypercritical examination of the conduct of the injured party, or merely for the purpose of showing that the injured person might have taken steps which seemed wiser or would have been more advantageous to the defaulter." *In re Kellett Aircraft,* 186 F.2d at 198–99; *see also Apex Min. Co. v. Chicago Copper & Chemical Co.,* 306 F.2d 725, 731 (8th Cir.1962). Rather, the breaching party must show that reasonable possibilities for mitigation existed and were ignored. *See T.C. Bateson Construction Co. v. United States,* 162 Ct.Cl. 145, 319 F.2d

135, 160 (1963); *Robinson v. United States,* 50 Fed.Cl. 368, 370 (2001); *Midwest Indus. Painting of Fla., Inc. v. United States,* 4 Cl.Ct. 124, 134 (1983).

 Burnishing this "undue risk and expense" standard, *Williston on Contracts* provides that "almost any risk of considerable loss to the injured person if he attempts to mitigate damages should be considered undue." 11 Samuel Williston, *A Treatise on the Law of Contracts* (Williston on Contracts) § 1353 (3d ed.1968); *see also Brazos Electric Power Coop., Inc. v. United States,* 52 Fed. Cl. 121, 129 (2002). While reasonable cost-avoiding steps include affirmative efforts to make substitute arrangements compensating for the lack of contract performance, such arrangements need not be entered into if they would expose the party to undue risk or significantly compromise its interests. *See* Restatement (Second) of Contracts § 350 cmts. c & g; *see also Westamerica Mortgage Co. v. First Nationwide Bank,* 1988 WL 76377 at *5 (D.Colo.1988). Thus, an injured party is not expected to "exalt the interests of the defaulter to his own probable detriment." *In re Kellett Aircraft,* 186 F.2d at 199; *see also Contempo Design, Inc. v. Chicago and N.E. Ill. Dist. Council of Carpenters,* 226 F.3d 535, 554–55 (7th Cir.2000), *cert. denied,* 531 U.S. 1078, 121 S.Ct. 776, 148 L.Ed.2d 674 (2001); John Calamari & Joseph Perillo, The Law of Contracts § 14–15 (3d ed.1987). Accordingly, courts have been reluctant to require parties, under the duty to mitigate, to deal further with the breaching party, especially if the breacher's alternative terms differ substantially from those of the original contract. *Stanspec Corp. v. Jelco, Inc.,* 464 F.2d 1184, 1187 (10th Cir.1972); *Campfield v. Sauer,* 189 F. 576 (6th Cir. 1911).[3] And, in particular, a plaintiff is not required to mitigate losses by "accepting an arrangement with the breaching party made conditional on the plaintiff's surrender of its rights under the repudiated contract." *Brazos,* 52 Fed.Cl. at 129; *see also Teradyne,*

---

**3.** *See also Cain v. Grosshans & Petersen, Inc.,* 196 Kan. 497, 413 P.2d 98, 102 (1966) ("An innocent party is not [automatically] required to execute a less advantageous contract with one who has already welshed on his agreement."); *Coppola v. Marden, Orth & Hastings Co.,* 282 Ill. 281, 118 N.E. 499 (1917) (purchaser has no duty to pay in cash when credit terms are material part of the contract); Charles J. Goetz & Robert E. Scott, The Mitigation Principle: Toward A General Theory of Contractual Obligation, 69 Va. L.Rev. 967, 993 n. 57 (1983).

*Inc. v. Teledyne Industries, Inc.,* 676 F.2d 865, 870 (1st Cir.1982); Restatement (Second) of Contracts § 350, cmt. e (1981).

■ Defendant asservates that the IRS's second auction presented plaintiff with a "suitable substitute transaction" on substantially the same terms as the first sale. It, therefore, claims that it was unreasonable for Mr. Koby not to participate in the second round of bidding, so as to mitigate the damages owed on the breach of the original contract. *Per contra.*

Of course, the second auction involved the same property as the first sale. But, after that, the terms of the two transactions diverged dramatically. The second auction was not an offer to sell plaintiff the Oceanside property, even on less advantageous terms, but rather an open-ended offer, extended to the public at large, to sell the apartments to the highest bidder. The latter transaction thus did not involve remotely the same type of performance owed under the prior contract—one required a sale at a specified price, subject only to the property being redeemed by its original owner; the other was little more than an offer to make an offer, with the price yet to be determined, and no assurance whatsoever that plaintiff would be the highest bidder. Indeed, apart from the basilar difference between a contract of sale and a mere invitation to participate in an auction, the terms of the second auction also differed significantly from those of the first—the second minimum sale price was almost four times the original minimum, and the second auction, under the terms of the tax redemption statute, afforded the prior owner 121 additional days in which to redeem the property (*e.g.,* 180 days from the second auction date).[4] Accordingly, defendant is simply wrong in suggesting that a reasonable person, acting under the circumstances, would have embraced the offer of participating in the second auction as a substitute for the performance lost when the IRS breached the original contract.

Indeed, contrary to defendant's claims, it is far from clear that Mr. Koby could have

avoided any losses by participating in the second auction. Looking at the end result of that second auction, defendant blithely assumes that plaintiff would have won the property with a bid significantly lower than what he originally paid. But, this is rank speculation. The record offers multiple possible reasons why the winning bid at the second auction was less than at the first, despite the $90,000 increase in the minimum bid price. Mr. Koby's pending quiet title action and his threat to sue the winning bidder at the second auction, as well as the government's failure to announce its reasons for holding a second sale and revising the minimum bid, all likely contributed to reduce the number of bidders and, in turn, depress the resulting sale price. Had Mr. Koby relented and participated in the second auction, removing the cloud of extensive litigation over the property, the resulting price might have been much higher. We will never know. Defendant provided essentially no evidence on this point, choosing instead simply to assume, rather than prove, that the resulting price would have been the same. In the court's view, this assumption is not borne out by the record and represents a pedantic form of "Monday-morning quarterbacking" that is contrary to the established standard of evaluating reasonableness from the perspective of "one viewing the situation at the time the problem was presented." *In re Kellett Aircraft,* 186 F.2d at 198.

Even had Mr. Koby prevailed in the second sale, he could have, by his very participation, severely compromised his ability to seek any damages under the first contract. Mr. Koby testified that he used all of his available resources to pay the purchase price of the first sale and, therefore, did not have funds available to bid at the second sale without cashing the check he had received from the IRS relating to the first sale. Accepting the reimbursement of his consideration and engaging in further negotiations with the defendant for sale of the same property could easily have been construed as abandoning his rights under the first con-

---

**4.** Notably, this extension of the redemption period occurred at a time when real estate prices were appreciating. Defendant admits that as the price of the property appreciated, the likelihood of the taxpayer redeeming increased.

tract via some rescission, compromise, or accord and satisfaction. A decision to abandon contract rights can be conveyed through a formal agreement of rescission or through the acts and conduct of the parties indicating such an intent. *See Nebco & Assocs. v. United States*, 23 Cl.Ct. 635, 642 (1991); *Montana Bank of Circle, N.A. v. United States*, 7 Cl.Ct. 601, 610 (1985); *see also* Restatement (Second) of Contracts §§ 279 & 283, cmt. a (1981). When a party engages in acts inconsistent with the existence of a contract, including acquiescing in a repudiation of the contract by the other party, courts have found an objective intent to abandon despite the party's assertion of subjective intent to the contrary.[5]

While it is unlikely that cashing the refund check alone would have been sufficient to indicate Mr. Koby's intent to abandon his contract rights, *see Avemco Ins. Co.*, 38 P.3d at 565; *Pino*, 627 So.2d at 537, the combination of cashing the check and attempting to repurchase the property might have led a court to find that such an abandonment had occurred. That, in fact, is what the Supreme Court of Minnesota found when a defendant municipality repudiated a contract awarded through a public bidding process and the plaintiff subsequently submitted a revised bid for the project. *See Minnesota Ltd., Inc.*, 208 N.W.2d at 286–87. The Minnesota high court specifically rejected plaintiff's argument that its participation in the second round of bidding was an attempt to mitigate damages on the grounds that "it would be pure speculation that plaintiff would be the ultimate successful bidder." *Id.* at 287. Although obviously not binding on this court, this case, and. others applying the doctrine of repudiation, certainly indicate that Mr. Koby's decision, on the advice of counsel, not to participate in the second auction was within the zone of reasonableness. Mr. Koby was not obligated to risk surrendering his rights under the first contract in order to minimize defendant's damages.[6] *See Teradyne*, 676 F.2d at 870; *Stanspec Corp.*, 464 F.2d at 1187; *Campfield*, 189 F. at 579–80.

To be sure, plaintiff might have expressly reserved his rights under the first contract, indicating that his cashing of the check and participation in the second auction were not intended to waive defendant's prior breach. *See U.S. Navigation Co. v. Black Diamond Lines, Inc.*, 124 F.2d 508, 510 (2d Cir.1942) (Hand, J.). But, the case law suggests that such a reservation still would have been somewhat risky. More importantly, any attempt to construct such an arrangement here was thwarted by defendant's own actions in shielding Mr. Koby from the truth. Mr. Rude acknowledged that, prior to the second sale, he never really explained to Mr. Koby the reasons for canceling the first contract, conducting the second auction and increasing the minimum bid.[7] Indeed, the record sug-

---

**5.** *See Avemco Ins. Co. v. Northern Colo. Air Charter, Inc.*, 38 P.3d 555, 565 (Colo.2002) ("the subjective intent of [a party] not to rescind is immaterial when that [party] has acted in a manner that demonstrates an objective manifestation of consent to the rescission intended by the [other party]."); *Minnesota Ltd., Inc. v. Pub. Utils. Comm'n of Hibbing*, 296 Minn. 316, 208 N.W.2d 284, 286 (1973) ("A repudiation of a contract by one party, acquiesced in by the other, is tantamount to a rescission."). *But see Pino v. Union Bankers Ins. Co.*, 627 So.2d 535, 538 (Fla.Dist.Ct. App.1993) ("unilateral announcement of rescission accompanied by a tender of the premiums to the insured does not evolve into an accord and satisfaction when the hapless insured deposits the check.").

**6.** With a surreal twist, defendant blithely maintains that Mr. Koby could have participated in the second auction, bid whatever was necessary to win, and then recouped the difference between his first bid and his second from the United States. This contention, of course, flies in the

face of defendant's initial litigating position in this case, *to wit*, that it had not breached any contract in canceling the first sale. Were this position correct, Mr. Koby could not have received any damages had he bought the property for a higher price at the second auction. The fact that defendant's position has since been rejected by this court does not alter the risks reasonably perceived by Mr. Koby at the time of the breach of the sale contract.

**7.** Mr. Rude testified that he did not remember exactly what he had told either Mr. Koby or his attorney prior to the sale. As noted above, in his deposition concerning his conversations with Mr. Koby, he indicated more candidly that "I was pretty vague with him because I obviously was embarrassed about making a mistake." Plaintiff's confusion regarding the reasons for the cancellation of the first sale apparently persisted through August 21, 1997, when Mr. Saavedra sent Mr. Rude a letter specifically requesting "a written explanation for the basis of canceling the

gests that he essentially misled Mr. Koby into believing that the problem was that Mr. Bachrach had not received personal notice of the first sale, rather than no notice at all. Mr. Koby was not advised of the statutory violation in the first sale until September 22, 1997, three weeks after the second auction.[8] Further, while the IRS made the decision to rescind the prior sale and reauction the property on or about June 27, 1997, it waited three weeks, until July 17, 1997, to notify Mr. Koby of the rescission, and then waited three more weeks, until August 7, 1997, before notifying him about the new auction date. And, despite having failed to explain adequately the reasons for its prior breach of contract, the IRS refused to postpone the new auction date when repeatedly requested to do so by plaintiff.

Thus, the circumstances, as they were actually known to Mr. Koby prior to the second auction, were that the IRS had unilaterally and for questionable reasons canceled the original sales contract and then initiated a second public bidding process using a drastically increased minimum sales price. As explained in the letter Mr. Saavedra sent to Mr. Rude a week before the second sale, plaintiff's conclusion from these circumstances was that "the IRS simply wants another chance to sell this property at a higher price." The IRS perpetuated this view by failing to respond to the various inquiries and meeting requests made by plaintiff and his counsel. Plaintiff, acting on the advice of counsel, ultimately chose to encourage defendant to perform on the first contract, rather than make a second offer to purchase the property. On the facts known to Mr. Koby prior to the second auction, and given the relatively little time in which he had to act, the court cannot say that plaintiff's choice was unreasonable. *Compare Hale Container Line, Inc. v. Houston Sea Packing Co.*, 137 F.3d 1455, 1474 (11th Cir.1998) (in determin-

ing reasonableness of plaintiff's mitigation efforts, court "must consider that 'the necessity for decision-making was thrust upon him by the defendant,'" and "'allow the injured party a wide latitude in determining how best to deal with the situation.'").

That plaintiff might have acted differently had he known what Mr. Rude and the IRS knew is irrelevant—"[m]itigation does not require prescience; it requires reasonableness." *Ketchikan Pulp Co. v. United States*, 20 Cl.Ct. 164, 166 (1990). Indeed, as the party in default, defendant here was all the more duty-bound to minimize damages and thus should not be heard to complain of plaintiff's supposed failure to mitigate when that failure, at least in part, is attributable to its own employees' lack of candor and responsiveness. *See* Williston, *supra*, § 1353 at 279; *see also* 5 Arthur L. Corbin, *Corbin on Contracts* (*Corbin*) § 1039 at 250–51 (1964) ("Losses are not regarded as avoidable if the defendant himself prevents the plaintiff from taking the steps necessary to avoid them."). Simply put, logic suggests that, at a minimum, plaintiff was entitled to know the real reason why the IRS had breached his first contract before he could be expected to enter into a second. *See* Corbin, *supra*, § 1043 at 274 (noting that cases requiring a plaintiff to deal with a defaulting defendant "should depend, to some extent, upon the reason causing the defendant to commit a breach and also upon the manner in which it was committed."). That information, however, was withheld from plaintiff until after the second auction. Under those circumstances, plaintiff was not required to take the economic equivalent of a Kierkegaardian leap of faith, sacrificing blindly his own interests in an effort to exalt those of the defaulting defendant.

Summarizing, this court finds that Mr. Koby acted reasonably in not participating in the second auction. As such, he did not fail

---

April 30, 1997 sale, including any notices sent the taxpayer." That letter was followed by a similar letter, addressed to IRS district counsel, dated September 9, 1997, a little more than a week after the second auction. The September 9 letter requested "the courtesy of a response to our letter as to the legal grounds and basis for claiming the original sale was invalid."

8. In a September 22, 1997 letter from the IRS district counsel to Mr. Koby's attorney, the government for the first time clearly acknowledged that "In this case, Mr. Rude did not give notice of the sale to the owner until after the sale ... The sale to Mr. Koby was not conducted in accordance with the sale provisions of the Internal Revenue Code."

improperly to mitigate his damages here. Defendant did not prove otherwise and its affirmative defense, therefore, must fail.

### B. Viability of Plaintiff's Damage Theories

The court's next task is to determine, based on the facts revealed so far, whether any of plaintiff's damage theories are unviable. As will be discussed below, the court concludes that the viability of plaintiff's damage theories hinges on various yet unresolved questions of fact.

Plaintiff seeks damages on a myriad of alternative legal theories. First, in the nature of expectancy damages, he asserts that he is entitled to recover lost profits for rental income for the time period between the date of the breach and the date of trial. Alternatively, he seeks expectation damages as measured by the difference between the value of the property on the date of the breach and the contract price, plus consequential damages. Finally, he seeks reliance damages to recoup the expenses he incurred attempting to restore the habitability of the property while he was the beneficial owner. Defendant challenges each of these theories, arguing that plaintiff should receive no more than the amount of interest he would have earned had Mr. Bachrach redeemed the property prior to the end of the first redemption period. Because of the unique nature of this contract, however, defendant's attempts to limit plaintiff's damage awards are, at least, premature.

■ Under the contract here, defendant could fulfill its obligation by either: (i) conveying a Director's Deed to plaintiff upon the expiration of the redemption period; *or* (ii) refunding plaintiff's purchase price plus interest upon redemption by the taxpayer. Such contracts, typically referred to as alternative contracts, present unique damage issues when the party with optional performance commitments repudiates the contract anticipatorily. *See In the Matter of The Community Medical Center,* 623 F.2d 864, 867 (3rd Cir.1980); *see also* 5 Corbin, *supra,* § 1070 at 397 (If "either alternative operates as a complete discharge of the promisor's duty and prevents any further remedy

against him" the agreement may be viewed as an alternative contract.). The general rule is that, unless the contract specifically preserved the right of election for the promisee, "in the case of breach without an election (of alternatives), [damages] (shall be) in accordance with the alternative that will result in the smallest recovery." *The Community Medical Center,* 623 F.2d at 867–68 (quoting Restatement of Contracts § 344 (1932)); *see also Western Oil & Fuel Co. v. Kemp,* 245 F.2d 633, 640 (8th Cir.1957). The *ratio dicendi* for this rule is that the court may not place the promisee in a better position than had the contract been performed— it presumes that the promisor had bargained for the flexibility of the alternatives and, therefore, should be liable for no more than the least expensive alternative he could have chosen. *See Podlesnick v. Airborne Exp., Inc.,* 627 F.Supp. 1113, 1116 (S.D.Ohio 1986), *aff'd per curiam,* 836 F.2d 550, 1987 WL 27461 (6th Cir.1987); *see also Liberty Bank v. Talman Home Mortgage Corp.,* 877 F.2d 400, 407 (5th Cir.1989); 5 Corbin, *supra,* § 1079.

The difference here, of course, is that the election of performance alternatives was not to be made by either contracting party, but rather by the third-party taxpayer, who had 180 days in which to redeem the property. This distinction renders *sui generis* the rule limiting plaintiff to the alternative least burdensome to the defendant. *See Podlesnick,* 627 F.Supp. at 1116 (holding that the rules of recovery for breach of an alternative contract are not suitable in case where promisor did not retain flexibility of performance). What is critical is which alternative would have been selected by the taxpayer who previously owned the property had the government not breached the contract. And, on that count, the factual field is currently unplowed. Thus, while Mr. Bachrach paid the redemption price after the second sale, no evidence has been presented as to whether he was willing or able to have met the higher redemption price at the earlier deadline imposed by the terms of the first sale. Mr. Bachrach's willingness and ability to redeem according to the guidelines of the first sale may not be presumed, but must be proven.

Thus, it would be premature to limit or define plaintiff's expectation damages at this time.[9]

▮ Defendant also seeks to deny plaintiff the ability to recover the lost profits it arguably would have earned had it received the property. Defendant argues that plaintiff cannot prove such damages with sufficient certainty to meet the rigorous standards established for the recovery of lost profits. In the limited cases where lost profits have been awarded, plaintiffs have been required to show, by a preponderance of the evidence, that: (i) the loss was caused by the breaching party's action; (ii) the lost profits were foreseeable by the breaching party; and (iii) the amount of the lost profits can be established with "reasonable certainty." *See Energy Capital Corp. v. United States,* 47 Fed. Cl. 382, 393–94 (2000), *aff'd,* 302 F.3d 1314 (Fed.Cir.2002); *see also Neely v. United States,* 152 Ct.Cl. 137, 285 F.2d 438 (1961). In distinguishing between speculative profits and those recoverable, the Federal Circuit has focused on "profits on the use of the subject of the contract itself" versus "profits of . . . collateral undertakings, which the corporation was unable to carry out." *Wells Fargo v. United States,* 88 F.3d 1012, 1022–23 (Fed.Cir.1996), *cert. denied,* 520 U.S. 1116, 117 S.Ct. 1245, 137 L.Ed.2d 328 (1997) (quoting *Ramsey v. United States,* 121 Ct.Cl. 426, 101 F.Supp. 353 (1951)). The profits which plaintiff seeks here are those potentially generated by the specific contract that the government breached. Although rare, lost profits have been awarded in such circumstances, particularly, where, as here, an ongoing busi-

ness is involved. *See Neely,* 285 F.2d at 442 (lost profits permitted when the government breached an agreement to lease land for mining); *see also Energy Capital,* 302 F.3d at 1327. As factual issues loom large regarding each of the critical elements for proving lost profits—reasonable certainty, causation and foreseeability—it would be premature for this court to rule on plaintiff's entitlement or disentitlement to such damages without an appropriate factual predicate. *See California Federal Bank, FSB v. United States,* 245 F.3d 1342, 1349 (Fed.Cir.2001), *cert. denied,* 534 U.S. 1113, 122 S.Ct. 920, 151 L.Ed.2d 884 (2002). In short, while plaintiff's attempt to recover lost profits faces an uphill climb, in the end, that steep slope may yet prove surmountable.

Finally, addressing one of plaintiff's alternative damage theories, defendant argues that Mr. Koby should not be allowed to recover the funds he expended on the property during the first redemption period. Defendant stresses that Mr. Rude warned the bidders at the first auction that they should not incur expenses on the property until the redemption period ran. It contends that plaintiff could not have recouped these expenses had the first sales contract been fully performed and asserts, therefore, that these expenses cannot be considered expectation damages, which are designed to place the wronged party in the position it would have been had the contract been performed. *See White v. Delta Constr. Int'l, Inc.,* 285 F.3d 1040, 1043 (Fed.Cir.2002). Plaintiff retorts that, despite Mr. Rude's dire warning, he was required, under California law, to ad-

---

9. It is less clear, at this time, what impact Mr. Bachrach's testimony will have on any damages awarded. There are two possible ways to account for his testimony. The first would be to award plaintiff a full measure of damages if it is determined, based on a preponderance of the evidence, that Mr. Bachrach was not prepared to redeem the property within the first redemption period. The second approach, which some courts have called the loss of chance doctrine, would be to award plaintiff damages based upon the percentage likelihood that Mr. Bachrach would have redeemed the property—if there were 25 percent chance of redemption, then certain of plaintiff's damages would be discounted to reflect this likelihood of redemption. The latter approach is suggested by Restatement

(Second) Of Contracts § 348(3), which provides that—"If a breach is of a promise conditioned on a fortuitous event and it is uncertain whether the event would have occurred had there been no breach, the injured party may recover damages based on the value of the conditional right at the time of breach." In the court's view, the choice between these approaches may either be informed by future factual development here or rendered moot thereby (*e.g.,* if proof indicated that it was a 100 percent surety either that Mr. Bachrach would redeem or not redeem the property). *See Wright v. St. Mary's Medical Center of Evansville, Inc.,* 59 F.Supp.2d 794, 801 & n. 2 (S.D.Ind.1999). At all events, the court defers judgment on this matter.

dress immediately certain hazardous situations on the property and could not await the end of the redemption period. Yet, it is apparent that such expenses are not recoverable as expectation damages because plaintiff would not have been able to recover those expenses had the contract been fully performed.

█ Such expenses, however, may be recoupable as reliance damages. As observed by the Federal Circuit, "[i]n order to be recoverable as reliance damages, . . ., plaintiff's loss must have been foreseeable to the party in breach at the time of contract formation." *Landmark Land Co., Inc. v. FDIC,* 256 F.3d 1365, 1378 (Fed.Cir.2001). *See also Glendale Federal Bank, FSB v. United States,* 239 F.3d 1374, 1382–83 (Fed.Cir. 2001); Restatement (Second) of Contracts § 344(b) (promisee's "reliance interest" is "his interest in being reimbursed for loss caused by reliance on the contract by being put in as good a position as he would have been in had the contract not been made."). As to foreseeability, the trial record certainly indicates that the IRS did not anticipate plaintiff making unnecessary capital improvements or performing maintenance that could be delayed. Yet, notwithstanding Mr. Rude's warning, the IRS hardly could have expected plaintiff to be forced into the Dickensian role of a slumlord and leave unremedied, for 180 days, dangerous or hazardous conditions that rendered the occupied apartments unsafe or uninhabitable. Certainly, the need to address immediately some of these problems should have been foreseen by Mr. Rude, who inspected the property and testified that it "was extremely run down." At trial, counsel for the government, indeed, readily admitted that under California law, Mr. Koby, as the temporary landlord of the property during the redemption period, was required to make the property habitable. This admission was well-advised.[10]

Instead, defendant correctly argues that this court must decide whether, and to what extent, hazards actually existed on the property that needed to be immediately remedied. Although the trial focused on facts relating to mitigation, the record incidentally included information that suggests that hazards, indeed, may have existed on the property. Thus, for example, Mr. Koby testified that there was abandoned furniture (including old mattresses), trash, and a car up on blocks in the common areas of the apartment complex, around which children were playing. He also testified as to pressing problems involving oil spills, broken exterior safety lighting, plumbing, exposed electrical sockets, other unsafe wiring, and blocked exhaust vents. Left unexplored at the trial were any significant details regarding these problems, and whether all the costs incurred by Mr. Koby related to these types of hazards and were reasonable in amount. In the court's view, proof that such hazards existed and that Mr. Koby appropriately responded to his obligations under California law as the property's landlord could pave the way for him to recover his reasonable expenses as reliance damages. Resolution of that matter, however, awaits another day.

## III. CONCLUSION

So ends round two of this litigation. For the foregoing reason, this court finds that plaintiff was not required to mitigate its damages in the fashion that defendant contends. Further, in the court's view, all of plaintiff's damage theories remain viable, subject, of course, to further proof of the critical elements thereof. Toward the latter end, by September 23, 2002, the parties shall file a joint status report indicating how this case should proceed, including, if relevant, a schedule for trial proceedings on damages.

**IT IS SO ORDERED.**

---

10. *See, e.g., Camacho v. Du Sung Corp.,* 121 F.3d 1315, 1317 (9th Cir.1997) (under California law, landlord "generally has a responsibility to inspect the premises and ensure that they are safe for the purposes intended"); *Portillo v. Aiassa,* 27 Cal.App.4th 1128, 32 Cal.Rptr.2d 755, 757–59 (1994) (landlord has duty to discover dangerous conditions and address them).